# GREGG *v.* GEORGIA

No. 74–6257.   Argued March 31, 1976—Decided July 2, 1976

156

*G. Hughel Harrison,* by appointment of the Court, 424 U. S. 941, argued the cause and filed a brief for petitioner.

*G. Thomas Davis,* Senior Assistant Attorney General of Georgia, argued the cause for respondent. With him on the brief were *Arthur K. Bolton,* Attorney General, *Robert S. Stubbs II,* Chief Deputy Attorney General, *Richard L. Chambers,* Deputy Attorney General, *John B. Ballard, Jr.,* Assistant Attorney General, and *Bryant Huff.*

*Solicitor General Bork* argued the cause for the United States as *amicus curiae.* With him on the brief was *Deputy Solicitor General Randolph. William E. James,* Assistant Attorney General, argued the cause for the State of California as *amicus curiae.* With him on the brief were *Evelle J. Younger,* Attorney General, and *Jack R. Winkler,* Chief Assistant Attorney General.*

Judgment of the Court, and opinion of MR. JUSTICE STEWART, MR. JUSTICE POWELL, and MR. JUSTICE STEVENS, announced by MR. JUSTICE STEWART.

The issue in this case is whether the imposition of the sentence of death for the crime of murder under the law of Georgia violates the Eighth and Fourteenth Amendments.

## I

The petitioner, Troy Gregg, was charged with committing armed robbery and murder. In accordance with Georgia procedure in capital cases, the trial was in two stages, a guilt stage and a sentencing stage. The evidence at the guilt trial established that on November 21, 1973, the petitioner and a traveling companion, Floyd Allen, while hitchhiking north in Florida were picked up by Fred Simmons and Bob Moore. Their car broke down, but they continued north after Simmons purchased another vehicle with some of the cash he was carrying. While still in Florida, they picked up another hitchhiker, Dennis Weaver, who rode with them to Atlanta, where he was let out about 11 p. m.

---

*Jack Greenberg, James M. Nabrit III, Peggy C. Davis,* and *Anthony G. Amsterdam* filed a brief for the N. A. A. C. P. Legal Defense and Educational Fund, Inc., as *amicus curiae* urging reversal.

*Arthur M. Michaelson* filed a brief for Amnesty International as *amicus curiae.*

A short time later the four men interrupted their journey for a rest stop along the highway. The next morning the bodies of Simmons and Moore were discovered in a ditch nearby.

On November 23, after reading about the shootings in an Atlanta newspaper, Weaver comunicated with the Gwinnett County police and related information concerning the journey with the victims, including a description of the car. The next afternoon, the petitioner and Allen, while in Simmons' car, were arrested in Asheville, N. C. In the search incident to the arrest a .25-caliber pistol, later shown to be that used to kill Simmons and Moore, was found in the petitioner's pocket. After receiving the warnings required by *Miranda* v. *Arizona,* 384 U. S. 436 (1966), and signing a written waiver of his rights, the petitioner signed a statement in which he admitted shooting, then robbing Simmons and Moore. He justified the slayings on grounds of self-defense. The next day, while being transferred to Lawrenceville, Ga., the petitioner and Allen were taken to the scene of the shootings. Upon arriving there, Allen recounted the events leading to the slayings. His version of these events was as follows: After Simmons and Moore left the car, the petitioner stated that he intended to rob them. The petitioner then took his pistol in hand and positioned himself on the car to improve his aim. As Simmons and Moore came up an embankment toward the car, the petitioner fired three shots and the two men fell near a ditch. The petitioner, at close range, then fired a shot into the head of each. He robbed them of valuables and drove away with Allen.

A medical examiner testified that Simmons died from a bullet wound in the eye and that Moore died from bullet wounds in the cheek and in the back of the head. He further testified that both men had several bruises

and abrasions about the face and head which probably were sustained either from the fall into the ditch or from being dragged or pushed along the embankment. Although Allen did not testify, a police detective recounted the substance of Allen's statements about the slayings and indicated that directly after Allen had made these statements the petitioner had admitted that Allen's account was accurate. The petitioner testified in his own defense. He confirmed that Allen had made the statements described by the detective, but denied their truth or ever having admitted to their accuracy. He indicated that he had shot Simmons and Moore because of fear and in self-defense, testifying they had attacked Allen and him, one wielding a pipe and the other a knife.[1]

The trial judge submitted the murder charges to the jury on both felony-murder and nonfelony-murder theories. He also instructed on the issue of self-defense but declined to instruct on manslaughter. He submitted the robbery case to the jury on both an armed-robbery theory and on the lesser included offense of robbery by intimidation. The jury found the petitioner guilty of two counts of armed robbery and two counts of murder.

At the penalty stage, which took place before the same jury, neither the prosecutor nor the petitioner's lawyer offered any additional evidence. Both counsel, however, made lengthy arguments dealing generally with the propriety of capital punishment under the circumstances and with the weight of the evidence of guilt. The trial judge instructed the jury that it could recommend either a death sentence or a life prison sentence on each count.

---

[1] On cross-examination the State introduced a letter written by the petitioner to Allen entitled, "[a] statement for you," with the instructions that Allen memorize and then burn it. The statement was consistent with the petitioner's testimony at trial.

The judge further charged the jury that in determining what sentence was appropriate the jury was free to consider the facts and circumstances, if any, presented by the parties in mitigation or aggravation.

Finally, the judge instructed the jury that it "would not be authorized to consider [imposing] the penalty of death" unless it first found beyond a reasonable doubt one of these aggravating circumstances:

> "One—That the offense of murder was committed while the offender was engaged in the commission of two other capital felonies, to-wit the armed robbery of [Simmons and Moore].
>
> "Two—That the offender committed the offense of murder for the purpose of receiving money and the automobile described in the indictment.
>
> "Three—The offense of murder was outrageously and wantonly vile, horrible and inhuman, in that they [sic] involved the depravity of [the] mind of the .defendant." Tr. 476–477.

Finding the first and second of these circumstances, the jury returned verdicts of death on each count.

The Supreme Court of Georgia affirmed the convictions and the imposition of the death sentences for murder. 233 Ga. 117, 210 S. E. 2d 659 (1974). After reviewing the trial transcript and the record, including the evidence, and comparing the evidence and sentence in similar cases in accordance with the requirements of Georgia law, the court concluded that, considering the nature of the crime and the defendant, the sentences of death had not resulted from prejudice or any other arbitrary factor and were not excessive or disproportionate to the penalty applied in similar cases.[2] The death

---

[2] The court further held, in part, that the trial court did not err in refusing to instruct the jury with respect to voluntary manslaughter since there was no evidence to support that verdict.

sentences imposed for armed robbery, however, were vacated on the grounds that the death penalty had rarely been imposed in Georgia for that offense and that the jury improperly considered the murders as aggravating circumstances for the robberies after having considered the armed robberies as aggravating circumstances for the murders. *Id.,* at 127, 210 S. E. 2d, at 667.

We granted the petitioner's application for a writ of certiorari limited to his challenge to the imposition of the death sentences in this case as "cruel and unusual" punishment in violation of the Eighth and the Fourteenth Amendments. 423 U. S. 1082 (1976).

## II

Before considering the issues presented it is necessary to understand the Georgia statutory scheme for the imposition of the death penalty.[3] The Georgia statute, as amended after our decision in *Furman* v. *Georgia,* 408 U. S. 238 (1972), retains the death penalty for six categories of crime: murder,[4] kidnaping for ransom or where

---

[3] Subsequent to the trial in this case limited portions of the Georgia statute were amended. None of these amendments changed significantly the substance of the statutory scheme. All references to the statute in this opinion are to the current version.

[4] Georgia Code Ann. § 26-1101 (1972) provides:

"(a) A person commits murder when he unlawfully and with malice aforethought, either express or implied, causes the death of another human being. Express malice is that deliberate intention unlawfully to take away the life of a fellow creature, which is manifested by external circumstances capable of proof. Malice shall be implied where no considerable provocation appears, and where all the circumstances of the killing show an abandoned and malignant heart.

"(b) A person also commits the crime of murder when in the commission of a felony he causes the death of another human being, irrespective of malice.

"(c) A person convicted of murder shall be punished by death or by imprisonment for life."

the victim is harmed, armed robbery,[5] rape, treason, and aircraft hijacking.[6] Ga. Code Ann. §§ 26–1101, 26–1311, 26–1902, 26–2001, 26–2201, 26–3301 (1972). The capital defendant's guilt or innocence is determined in the traditional manner, either by a trial judge or a jury, in the first stage of a bifurcated trial.

If trial is by jury, the trial judge is required to charge lesser included offenses when they are supported by any view of the evidence. *Sims* v. *State,* 203 Ga. 668, 47 S. E. 2d 862 (1948). See *Linder* v. *State,* 132 Ga. App. 624, 625, 208 S. E. 2d 630, 631 (1974). After a verdict, finding, or plea of guilty to a capital crime, a presentence hearing is conducted before whoever made the determination of guilt. The sentencing procedures are essentially the same in both bench and jury trials. At the hearing:

"[T]he judge [or jury] shall hear additional evidence in extenuation, mitigation, and aggravation of punishment, including the record of any prior criminal convictions and pleas of guilty or pleas of nolo contendere of the defendant, or the absence of any prior conviction and pleas: Provided, however, that

---

[5] Section 26–1902 (1972) provides:

"A person commits armed robbery when, with intent to commit theft, he takes property of another from the person or the immediate presence of another by use of an offensive weapon. The offense robbery by intimidation shall be a lesser included offense in the offense of armed robbery. A person convicted of armed robbery shall be punished by death or imprisonment for life, or by imprisonment for not less than one nor more than 20 years."

[6] These capital felonies currently are defined as they were when *Furman* was decided. The 1973 amendments to the Georgia statute, however, narrowed the class of crimes potentially punishable by death by eliminating capital perjury. Compare § 26–2401 (Supp. 1975) with § 26–2401 (1972).

only such evidence in aggravation as the State has made known to the defendant prior to his trial shall be admissible. The judge [or jury] shall also hear argument by the defendant or his counsel and the prosecuting attorney . . . regarding the punishment to be imposed." § 27–2503 (Supp. 1975).

The defendant is accorded substantial latitude as to the types of evidence that he may introduce. See *Brown* v. *State*, 235 Ga. 644, 647–650, 220 S. E. 2d 922, 925–926 (1975).[7] Evidence considered during the guilt stage may be considered during the sentencing stage without being resubmitted. *Eberheart* v. *State*, 232 Ga. 247, 253, 206 S. E. 2d 12, 17 (1974).[8]

In the assessment of the appropriate sentence to be imposed the judge is also required to consider or to include in his instructions to the jury "any mitigating circumstances or aggravating circumstances otherwise authorized by law and any of [10] statutory aggravating circumstances which may be supported by the evidence. . . ." § 27–2534.1 (b) (Supp. 1975). The scope of the non-statutory aggravating or mitigating circumstances is not delineated in the statute. Before a convicted defendant may be sentenced to death, however, except in cases of treason or aircraft hijacking, the jury, or the trial judge in cases tried without a jury, must find beyond a reasonable doubt one of the 10 aggravating circumstances speci-

---

[7] It is not clear whether the 1974 amendments to the Georgia statute were intended to broaden the types of evidence admissible at the presentence hearing. Compare § 27–2503 (a) (Supp. 1975) with § 27–2534 (1972) (deletion of limitation "subject to the laws of evidence").

[8] Essentially the same procedures are followed in the case of a guilty plea. The judge considers the factual basis of the plea, as well as evidence in aggravation and mitigation. See *Mitchell* v. *State*, 234 Ga. 160, 214 S. E. 2d 900 (1975).

fied in the statute.[9] The sentence of death may be imposed only if the jury (or judge) finds one of the statutory aggravating circumstances and then elects to

---

[9] The statute provides in part:

"(a) The death penalty may be imposed for the offenses of aircraft hijacking or treason, in any case.

"(b) In all cases of other offenses for which the death penalty may be authorized, the judge shall consider, or he shall include in his instructions to the jury for it to consider, any mitigating circumstances or aggravating circumstances otherwise authorized by law and any of the following statutory aggravating circumstances which may be supported by the evidence:

"(1) The offense of murder, rape, armed robbery, or kidnapping was committed by a person with a prior record of conviction for a capital felony, or the offense of murder was committed by a person who has a substantial history of serious assaultive criminal convictions.

"(2) The offense of murder, rape, armed robbery, or kidnapping was committed while the offender was engaged in the commission of another capital felony, or aggravated battery, or the offense of murder was committed while the offender was engaged in the commission of burglary or arson in the first degree.

"(3) The offender by his act of murder, armed robbery, or kidnapping knowingly created a great risk of death to more than one person in a public place by means of a weapon or device which would normally be hazardous to the lives of more than one person.

"(4) The offender committed the offense of murder for himself or another, for the purpose of receiving money or any other thing of monetary value.

"(5) The murder of a judicial officer, former judicial officer, district attorney or solicitor or former district attorney or solicitor during or because of the exercise of his official duty.

"(6) The offender caused or directed another to commit murder or committed murder as an agent or employee of another person.

"(7) The offense of murder, rape, armed robbery, or kidnapping was outrageously or wantonly vile, horrible or inhuman in that it involved torture, depravity of mind, or an aggravated battery to the victim.

"(8) The offense of murder was committed against any peace

impose that sentence. § 26–3102 (Supp. 1975). If the verdict is death, the jury or judge must specify the aggravating circumstance(s) found. § 27–2534.1 (c) (Supp. 1975). In jury cases, the trial judge is bound by the jury's recommended sentence. §§ 26–3102, 27–2514 (Supp. 1975).

In addition to the conventional appellate process available in all criminal cases, provision is made for special expedited direct review by the Supreme Court of Georgia of the appropriateness of imposing the sentence of death in the particular case. The court is directed to consider "the punishment as well as any errors enumerated by way of appeal," and to determine:

"(1) Whether the sentence of death was imposed

---

officer, corrections employee or fireman while engaged in the performance of his official duties.

"(9) The offense of murder was committed by a person in, or who has escaped from, the lawful custody of a peace officer or place of lawful confinement.

"(10) The murder was committed for the purpose of avoiding, interfering with, or preventing a lawful arrest or custody in a place of lawful confinement, of himself or another.

"(c) The statutory instructions as determined by the trial judge to be warranted by the evidence shall be given in charge and in writing to the jury for its deliberation. The jury, if its verdict be a recommendation of death, shall designate in writing, signed by the foreman of the jury, the aggravating circumstance or circumstances which it found beyond a reasonable doubt. In non-jury cases the judge shall make such designation. Except in cases of treason or aircraft hijacking, unless at least one of the statutory aggravating circumstances enumerated in section 27–2534.1 (b) is so found, the death penalty shall not be imposed." § 27–2534.1 (Supp. 1975).

The Supreme Court of Georgia, in *Arnold* v. *State*, 236 Ga. 534, 540, 224 S. E. 2d 386, 391 (1976), recently held unconstitutional the portion of the first circumstance encompassing persons who have a "substantial history of serious assaultive criminal convictions" because it did not set "sufficiently 'clear and objective standards.'"

under the influence of passion, prejudice, or any other arbitrary factor, and

"(2) Whether, in cases other than treason or aircraft hijacking, the evidence supports the jury's or judge's finding of a statutory aggravating circumstance as enumerated in section 27.2534.1 (b), and

"(3) Whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant." § 27–2537 (Supp. 1975).

If the court affirms a death sentence, it is required to include in its decision reference to similar cases that it has taken into consideration. § 27–2537 (e) (Supp. 1975).[10]

A transcript and complete record of the trial, as well as a separate report by the trial judge, are transmitted to the court for its use in reviewing the sentence. § 27–2537 (a) (Supp. 1975). The report is in the form of a 6½-page questionnaire, designed to elicit information about the defendant, the crime, and the circumstances of the trial. It requires the trial judge to characterize the trial in several ways designed to test for arbitrariness and disproportionality of sentence. Included in the report are responses to detailed questions concerning the quality of the defendant's representation, whether race played a role in the trial, and, whether, in the trial court's judgment, there was any doubt about

---

[10] The statute requires that the Supreme Court of Georgia obtain and preserve the records of all capital felony cases in which the death penalty was imposed after January 1, 1970, or such earlier date that the court considers appropriate. § 27–2537 (f) (Supp. 1975). To aid the court in its disposition of these cases the statute further provides for the appointment of a special assistant and authorizes the employment of additional staff members. §§ 27–2537 (f)–(h) (Supp. 1975).

the defendant's guilt or the appropriateness of the sentence. A copy of the report is served upon defense counsel. Under its special review authority, the court may either affirm the death sentence or remand the case for resentencing. In cases in which the death sentence is affirmed there remains the possibility of executive clemency.[11]

## III

We address initially the basic contention that the punishment of death for the crime of murder is, under all circumstances, "cruel and unusual" in violation of the Eighth and Fourteenth Amendments of the Constitution. In Part IV of this opinion, we will consider the sentence of death imposed under the Georgia statutes at issue in this case.

The Court on a number of occasions has both assumed and asserted the constitutionality of capital punishment. In several cases that assumption provided a necessary foundation for the decision, as the Court was asked to decide whether a particular method of carrying out a capital sentence would be allowed to stand under the Eighth Amendment.[12] But until *Furman* v. *Georgia,* 408 U. S. 238 (1972), the Court never confronted squarely the fundamental claim that the punishment of death always, regardless of the enormity of the offense or the procedure followed in imposing the sentence, is cruel and

---

[11] See Ga. Const., Art. 5, § 1, ¶ 12, Ga. Code Ann. § 2–3011 (1973); Ga. Code Ann. §§ 77–501, 77–511, 77–513 (1973 and Supp. 1975) (Board of Pardons and Paroles is authorized to commute sentence of death except in cases where Governor refuses to suspend that sentence).

[12] *Louisiana ex rel. Francis* v. *Resweber,* 329 U. S. 459, 464 (1947); *In re Kemmler,* 136 U. S. 436, 447 (1890); *Wilkerson* v. *Utah,* 99 U. S. 130, 134–135 (1879). See also *McGautha* v. *California,* 402 U. S. 183 (1971); *Witherspoon* v. *Illinois,* 391 U. S. 510 (1968); *Trop* v. *Dulles,* 356 U. S. 86, 100 (1958) (plurality opinion).

unusual punishment in violation of the Constitution. Although this issue was presented and addressed in *Furman,* it was not resolved by the Court. Four Justices would have held that capital punishment is not un-unconstitutional *per se;* [13] two Justices would have reached the opposite conclusion; [14] and three Justices, while agreeing that the statutes then before the Court were invalid as applied, left open the question whether such punishment may ever be imposed. [15] We now hold that the punishment of death does not invariably violate the Constitution.

## A

The history of the prohibition of "cruel and unusual" punishment already has been reviewed at length. [16] The phrase first appeared in the English Bill of Rights of 1689, which was drafted by Parliament at the accession of William and Mary. See Granucci, "Nor Cruel and Unusual Punishments Inflicted:" The Original Meaning, 57 Calif. L. Rev. 839, 852–853 (1969). The English version appears to have been directed against punishments unauthorized by statute and beyond the jurisdiction of the sentencing court, as well as those disproportionate to the offense involved. *Id.,* at 860. The

---

[13] 408 U. S., at 375 (BURGER, C. J., dissenting); *id.,* at 405 (BLACKMUN, J., dissenting); *id.,* at 414 (POWELL, J., dissenting); *id.,* at 465 (REHNQUIST, J., dissenting).

[14] *Id.,* at 257 (BRENNAN, J., concurring); *id.,* at 314 (MARSHALL, J., concurring).

[15] *Id.,* at 240 (Douglas, J., concurring); *id.,* at 306 (STEWART, J., concurring); *id.,* at 310 (WHITE, J., concurring).

Since five Justices wrote separately in support of the judgments in *Furman,* the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds—MR. JUSTICE STEWART and MR. JUSTICE WHITE. See n. 36, *infra.*

[16] 408 U. S., at 316–328 (MARSHALL, J., concurring).

American draftsmen, who adopted the English phrasing in drafting the Eighth Amendment, were primarily concerned, however, with proscribing "tortures" and other "barbarous" methods of punishment." *Id.,* at 842.[17]

In the earliest cases raising Eighth Amendment claims, the Court focused on particular methods of execution to determine whether they were too cruel to pass constitutional muster. The constitutionality of the sentence of death itself was not at issue, and the criterion used to evaluate the mode of execution was its similarity to "torture" and other "barbarous" methods. See *Wilkerson* v. *Utah,* 99 U. S. 130, 136 (1879) ("[I]t is safe to affirm that punishments of torture . . . and all others in the same line of unnecessary cruelty, are forbidden by that amendment . . ."); *In re Kemmler,* 136 U. S. 436, 447 (1890) ("Punishments are cruel when they involve torture or a lingering death . . ."). See also *Louisiana ex rel. Francis* v. *Resweber,* 329 U. S. 459, 464 (1947) (second attempt at electrocution found not to violate

---

[17] This conclusion derives primarily from statements made during the debates in the various state conventions called to ratify the Federal Constitution. For example, Virginia delegate Patrick Henry objected vehemently to the lack of a provision banning "cruel and unusual punishments":

"What has distinguished our ancestors?—That they would not admit of tortures, or cruel and barbarous punishment. But Congress may introduce the practice of the civil law, in preference to that of the common law. They may introduce the practice of France, Spain, and Germany—of torturing, to extort a confession of the crime." 3 J. Elliot, Debates 447–448 (1863).

A similar objection was made in the Massachusetts convention:

"They are nowhere restrained from inventing the most cruel and unheard-of punishments and annexing them to crimes; and there is no constitutional check on them, but that *racks* and *gibbets* may be amongst the most mild instruments of their discipline." 2 Elliot, *supra,* at 111.

Eighth Amendment, since failure of initial execution attempt was "an unforeseeable accident" and "[t]here [was] no purpose to inflict unnecessary pain nor any unnecessary pain involved in the proposed execution").

But the Court has not confined the prohibition embodied in the Eighth Amendment to "barbarous" methods that were generally outlawed in the 18th century. Instead, the Amendment has been interpreted in a flexible and dynamic manner. The Court early recognized that "a principle to be vital must be capable of wider application than the mischief which gave it birth." *Weems* v. *United States,* 217 U. S. 349, 373 (1910). Thus the Clause forbidding "cruel and unusual" punishments "is not fastened to the obsolete but may acquire meaning as public opinion becomes enlightened by a humane justice." *Id.,* at 378. See also *Furman* v. *Georgia,* 408 U. S., at 429–430 (POWELL, J., dissenting); *Trop* v. *Dulles,* 356 U. S. 86, 100–101 (1958) (plurality opinion).

In *Weems* the Court addressed the constitutionality of the Philippine punishment of *cadena temporal* for the crime of falsifying an official document. That punishment included imprisonment for at least 12 years and one day, in chains, at hard and painful labor; the loss of many basic civil rights; and subjection to lifetime surveillance. Although the Court acknowledged the possibility that "the cruelty of pain" may be present in the challenged punishment, 217 U. S., at 366, it did not rely on that factor, for it rejected the proposition that the Eighth Amendment reaches only punishments that are "inhuman and barbarous, torture and the like." *Id.,* at 368. Rather, the Court focused on the lack of proportion between the crime and the offense:

"Such penalties for such offenses amaze those who have formed their conception of the relation of a state to even its offending citizens from the practice

of the American commonwealths, and believe that it is a precept of justice that punishment for crime should be graduated and proportioned to offense." *Id.*, at 366–367.[18]

Later, in *Trop* v. *Dulles, supra,* the Court reviewed the constitutionality of the punishment of denationalization imposed upon a soldier who escaped from an Army stockade and became a deserter for one day. Although the concept of proportionality was not the basis of the holding, the plurality observed in dicta that "[f]ines, imprisonment and even execution may be imposed depending upon the enormity of the crime." 356 U. S., at 100.

The substantive limits imposed by the Eighth Amendment on what can be made criminal and punished were discussed in *Robinson* v. *California,* 370 U. S. 660 (1962). The Court found unconstitutional a state statute that made the status of being addicted to a narcotic drug a criminal offense. It held, in effect, that it is "cruel and unusual" to impose any punishment at all for the mere status of addiction. The cruelty in the abstract of the actual sentence imposed was irrelevant: "Even one day in prison would be a cruel and unusual punishment for the 'crime' of having a common cold." *Id.*, at 667. Most recently, in *Furman* v. *Georgia, supra,* three Justices in separate concurring opinions found the Eighth Amendment applicable to procedures employed to select convicted defendants for the sentence of death.

It is clear from the foregoing precedents that the

---

[18] The Court remarked on the fact that the law under review "has come to us from a government of a different form and genius from ours," but it also noted that the punishments it inflicted "would have those bad attributes even if they were found in a Federal enactment and not taken from an alien source." 217 U. S., at 377.

Eighth Amendment has not been regarded as a static concept. As Mr. Chief Justice Warren said, in an oft-quoted phrase, "[t]he Amendment must draw its meaning from the evolving standards of decency that mark the progress of a maturing society." *Trop* v. *Dulles, supra,* at 101. See also *Jackson* v. *Bishop,* 404 F. 2d 571, 579 (CA8 1968). Cf. *Robinson* v. *California, supra,* at 666. Thus, an assessment of contemporary values concerning the infliction of a challenged sanction is relevant to the application of the Eighth Amendment. As we develop below more fully, see *infra,* at 175–176, this assessment does not call for a subjective judgment. It requires, rather, that we look to objective indicia that reflect the public attitude toward a given sanction.

But our cases also make clear that public perceptions of standards of decency with respect to criminal sanctions are not conclusive. A penalty also must accord with "the dignity of man," which is the "basic concept underlying the Eighth Amendment." *Trop* v. *Dulles, supra,* at 100 (plurality opinion). This means, at least, that the punishment not be "excessive." When a form of punishment in the abstract (in this case, whether capital punishment may ever be imposed as a sanction for murder) rather than in the particular (the propriety of death as a penalty to be applied to a specific defendant for a specific crime) is under consideration, the inquiry into "excessiveness" has two aspects. First, the punishment must not involve the unnecessary and wanton infliction of pain. *Furman* v. *Georgia, supra,* at 392–393 (BURGER, C. J., dissenting). See *Wilkerson* v. *Utah,* 99 U. S., at 136; *Weems* v. *United States, supra,* at 381. Second, the punishment must not be grossly out of proportion to the severity of the crime. *Trop* v. *Dulles, supra,* at 100 (plurality opinion) (dictum); *Weems* v. *United States, supra,* at 367.

## B

Of course, the requirements of the Eighth Amendment must be applied with an awareness of the limited role to be played by the courts. This does not mean that judges have no role to play, for the Eighth Amendment is a restraint upon the exercise of legislative power.

"Judicial review, by definition, often involves a conflict between judicial and legislative judgment as to what the Constitution means or requires. In this respect, Eighth Amendment cases come to us in no different posture. It seems conceded by all that the Amendment imposes some obligations on the judiciary to judge the constitutionality of punishment and that there are punishments that the Amendment would bar whether legislatively approved or not." *Furman* v. *Georgia,* 408 U. S., at 313–314 (WHITE, J., concurring).

See also *id.,* at 433 (POWELL, J., dissenting).[19]

But, while we have an obligation to insure that con-

[19] Although legislative measures adopted by the people's chosen representatives provide one important means of ascertaining contemporary values, it is evident that legislative judgments alone cannot be determinative of Eighth Amendment standards since that Amendment was intended to safeguard individuals from the abuse of legislative power. See *Weems* v. *United States,* 217 U. S. 349, 371–373 (1910); *Furman* v. *Georgia,* 408 U. S., at 258–269 (BRENNAN, J., concurring). *Robinson* v. *California,* 370 U. S. 660 (1962), illustrates the proposition that penal laws enacted by state legislatures may violate the Eighth Amendment because "in the light of contemporary human knowledge" they "would doubtless be universally thought to be an infliction of cruel and unusual punishment." *Id.,* at 666. At the time of *Robinson* nine States in addition to California had criminal laws that punished addiction similar to the law declared unconstitutional in *Robinson.* See Brief for Appellant in *Robinson* v. *California,* O. T. 1961, No. 554, p. 15.

stitutional bounds are not overreached, we may not act as judges as we might as legislators.

> "Courts are not representative bodies. They are not designed to be a good reflex of a democratic society. Their judgment is best informed, and therefore most dependable, within narrow limits. Their essential quality is detachment, founded on independence. History teaches that the independence of the judiciary is jeopardized when courts become embroiled in the passions of the day and assume primary responsibility in choosing between competing political, economic and social pressures." *Dennis* v. *United States,* 341 U. S. 494, 525 (1951) (Frankfurter, J., concurring in affirmance of judgment).[20]

Therefore, in assessing a punishment selected by a democratically elected legislature against the constitutional measure, we presume its validity. We may not require the legislature to select the least severe penalty possible so long as the penalty selected is not cruelly inhumane or disproportionate to the crime involved. And a heavy burden rests on those who would attack the judgment of the representatives of the people.

This is true in part because the constitutional test is intertwined with an assessment of contemporary standards and the legislative judgment weighs heavily in ascertaining such standards. "[I]n a democratic society legislatures, not courts, are constituted to respond to the will and consequently the moral values of the people."

---

[20] See also *Furman* v. *Georgia, supra,* at 411 (BLACKMUN, J., dissenting):

"We should not allow our personal preferences as to the wisdom of legislative and congressional action, or our distaste for such action, to guide our judicial decision in cases such as these. The temptations to cross that policy line are very great."

*Furman* v. *Georgia, supra,* at 383 (BURGER, C. J., dissent-
ing). The deference we owe to the decisions of the state
legislatures under our federal system, 408 U. S., at 465–470
(REHNQUIST, J., dissenting), is enhanced where the speci-
fication of punishments is concerned, for "these are pecu-
liarly questions of legislative policy." *Gore* v. *United
States,* 357 U. S. 386, 393 (1958). Cf. *Robinson* v. *Cali-
fornia,* 370 U. S., at 664–665; *Trop* v. *Dulles,* 356 U. S.,
at 103 (plurality opinion); *In re Kemmler,* 136 U. S.,
at 447. Caution is necessary lest this Court become,
"under the aegis of the Cruel and Unusual Punishment
Clause, the ultimate arbiter of the standards of criminal
responsibility . . . throughout the country." *Powell* v.
*Texas,* 392 U. S. 514, 533 (1968) (plurality opinion). A
decision that a given punishment is impermissible under
the Eighth Amendment cannot be reversed short of a con-
stitutional amendment. The ability of the people to
express their preference through the normal democratic
processes, as well as through ballot referenda, is
shut off. Revisions cannot be made in the light of fur-
ther experience. See *Furman* v. *Georgia, supra,* at 461–
462 (POWELL, J., dissenting).

## C

In the discussion to this point we have sought to iden-
tify the principles and considerations that guide a court
in addressing an Eighth Amendment claim. We now
consider specifically whether the sentence of death for
the crime of murder is a *per se* violation of the Eighth
and Fourteenth Amendments to the Constitution. We
note first that history and precedent strongly support a
negative answer to this question.

The imposition of the death penalty for the crime of
murder has a long history of acceptance both in the
United States and in England. The common-law rule

imposed a mandatory death sentence on all convicted murderers. *McGautha* v. *California,* 402 U. S. 183, 197–198 (1971). And the penalty continued to be used into the 20th century by most American States, although the breadth of the common-law rule was diminished, initially by narrowing the class of murders to be punished by death and subsequently by widespread adoption of laws expressly granting juries the discretion to recommend mercy. *Id.,* at 199–200. See *Woodson* v. *North Carolina, post,* at 289–292.

It is apparent from the text of the Constitution itself that the existence of capital punishment was accepted by the Framers. At the time the Eighth Amendment was ratified, capital punishment was a common sanction in every State. Indeed, the First Congress of the United States enacted legislation providing death as the penalty for specified crimes. C. 9, 1 Stat. 112 (1790). The Fifth Amendment, adopted at the same time as the Eighth, contemplated the continued existence of the capital sanction by imposing certain limits on the prosecution of capital cases:

> "No person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury . . . ; nor shall any person be subject for the same offense to be twice put in jeopardy of life or limb; . . . nor be deprived of life, liberty, or property, without due process of law . . . ."

And the Fourteenth Amendment, adopted over three-quarters of a century later, similarly contemplates the existence of the capital sanction in providing that no State shall deprive any person of "life, liberty, or property" without due process of law.

For nearly two centuries, this Court, repeatedly and

often expressly, has recognized that capital punishment is not invalid *per se*. In *Wilkerson* v. *Utah,* 99 U. S., at 134–135, where the Court found no constitutional violation in inflicting death by public shooting, it said:

> "Cruel and unusual punishments are forbidden by the Constitution, but the authorities referred to are quite sufficient to show that the punishment of shooting as a mode of executing the death penalty for the crime of murder in the first degree is not included in that category, within the meaning of the eighth amendment."

Rejecting the contention that death by electrocution was "cruel and unusual," the Court in *In re Kemmler, supra,* at 447, reiterated:

> "[T]he punishment of death is not cruel, within the meaning of that word as used in the Constitution. It implies there something inhuman and barbarous, something more than the mere extinguishment of life."

Again, in *Louisiana ex rel. Francis* v. *Resweber,* 329 U. S., at 464, the Court remarked: "The cruelty against which the Constitution protects a convicted man is cruelty inherent in the method of punishment, not the necessary suffering involved in any method employed to extinguish life humanely." And in *Trop* v. *Dulles,* 356 U. S., at 99, Mr. Chief Justice Warren, for himself and three other Justices, wrote:

> "Whatever the arguments may be against capital punishment, both on moral grounds and in terms of accomplishing the purposes of punishment . . . the death penalty has been employed throughout our history, and, in a day when it is still widely accepted, it cannot be said to violate the constitutional concept of cruelty."

Four years ago, the petitioners in *Furman* and its companion cases predicated their argument primarily upon the asserted proposition that standards of decency had evolved to the point where capital punishment no longer could be tolerated. The petitioners in those cases said, in effect, that the evolutionary process had come to an end, and that standards of decency required that the Eighth Amendment be construed finally as prohibiting capital punishment for any crime regardless of its depravity and impact on society. This view was accepted by two Justices.[21] Three other Justices were unwilling to go so far; focusing on the procedures by which convicted defendants were selected for the death penalty rather than on the actual punishment inflicted, they joined in the conclusion that the statutes before the Court were constitutionally invalid.[22]

The petitioners in the capital cases before the Court today renew the "standards of decency" argument, but developments during the four years since *Furman* have undercut substantially the assumptions upon which their argument rested. Despite the continuing debate, dating back to the 19th century, over the morality and utility of capital punishment, it is now evident that a large proportion of American society continues to regard it as an appropriate and necessary criminal sanction.

The most marked indication of society's endorsement of the death penalty for murder is the legislative response to *Furman*. The legislatures of at least 35 States[23] have enacted new statutes that provide for the

[21] See concurring opinions of MR. JUSTICE BRENNAN and MR. JUSTICE MARSHALL, 408 U. S., at 257 and 314.

[22] See concurring opinions of Mr. Justice Douglas, MR. JUSTICE STEWART, and MR. JUSTICE WHITE, *id.*, at 240, 306, and 310.

[23] Ala. H. B. 212, §§ 2–4, 6–7 (1975); Ariz. Rev. Stat. Ann. §§ 13–452 to 13–454 (Supp. 1973); Ark. Stat. Ann. § 41–4706 (Supp. 1975); Cal. Penal Code §§ 190.1, 209, 219 (Supp. 1976); Colo.

death penalty for at least some crimes that result in the death of another person. And the Congress of the United States, in 1974, enacted a statute providing the death penalty for aircraft piracy that results in death.[24] These recently adopted statutes have attempted to address the concerns expressed by the Court in *Furman* primarily (i) by specifying the factors to be weighed and the procedures to be followed in deciding when to impose a capital sentence, or (ii) by making the death penalty mandatory for specified crimes. But all of the post-*Furman* statutes make clear that capital punish-

---

Laws 1974, c. 52, § 4; Conn. Gen. Stat. Rev. §§ 53a–25, 53a–35 (b), 53a–46a, 53a–54b (1975); Del. Code Ann. tit. 11, § 4209 (Supp. 1975); Fla. Stat. Ann. §§ 782.04, 921.141 (Supp. 1975–1976); Ga. Code Ann. §§ 26–3102, 27–2528, 27–2534.1, 27–2537 (Supp. 1975); Idaho Code § 18–4004 (Supp. 1975); Ill. Ann. Stat. c. 38, §§ 9–1, 1005–5–3, 1005–8–1A (Supp. 1976–1977); Ind. Stat. Ann. § 35–13–4–1 (1975); Ky. Rev. Stat. Ann. § 507.020 (1975); La. Rev. Stat. Ann. § 14:30 (Supp. 1976); Md. Ann. Code, art. 27, § 413 (Supp. 1975); Miss. Code Ann. §§ 97–3–19, 97–3–21, 97–25–55, 99–17–20 (Supp. 1975); Mo. Ann. Stat. § 559.009, 559.005 (Supp. 1976); Mont. Rev. Codes Ann. § 94–5–105 (Spec. Crim. Code Supp. 1976); Neb. Rev. Stat. §§ 28–401, 29–2521 to 29–2523 (1975); Nev. Rev. Stat. § 200.030 (1973); N. H. Rev. Stat. Ann. § 630:1 (1974); N. M. Stat. Ann. § 40A–29–2 (Supp. 1975); N. Y. Penal Law § 60.06 (1975); N. C. Gen. Stat. § 14–17 (Supp. 1975); Ohio Rev. Code Ann. §§ 2929.02–2929.04 (1975); Okla. Stat. Ann. tit. 21, § 701.1–701.3 (Supp. 1975–1976); Pa. Laws 1974, Act. No. 46; R. I. Gen. Laws Ann. § 11–23–2 (Supp. 1975); S. C. Code Ann. § 16–52 (Supp. 1975); Tenn. Code Ann. §§ 39–2402, 39–2406 (1975); Tex. Penal Code Ann. § 19.03 (a) (1974); Utah Code Ann. §§ 76–3–206, 76–3–207, 76–5–202 (Supp. 1975); Va. Code Ann. §§ 18.2–10, 18.2–31 (1976); Wash. Rev. Code §§ 9A.-32.045, 9A.32.046 (Supp. 1975); Wyo. Stat. Ann. § 6–54 (Supp. 1975).

[24] Antihijacking Act of 1974, 49 U. S. C. §§ 1472 (i), (n) (1970 ed., Supp. IV).

ment itself has not been rejected by the elected representatives of the people.

In the only statewide referendum occurring since *Furman* and brought to our attention, the people of California adopted a constitutional amendment that authorized capital punishment, in effect negating a prior ruling by the Supreme Court of California in *People* v. *Anderson,* 6 Cal. 3d 628, 493 P. 2d 880, cert. denied, 406 U. S. 958 (1972), that the death penalty violated the California Constitution.[25]

The jury also is a significant and reliable objective index of contemporary values because it is so directly involved. See *Furman* v. *Georgia,* 408 U. S., at 439–440 (POWELL, J., dissenting). See generally Powell, Jury Trial of Crimes, 23 Wash. & Lee L. Rev. 1 (1966). The Court has said that "one of the most important functions any jury can perform in making . . . a selection [between life imprisonment and death for a defendant convicted in a capital case] is to maintain a link between contemporary community values and the penal system." *Witherspoon* v. *Illinois,* 391 U. S. 510, 519 n. 15 (1968). It may be true that evolving standards have influenced juries in

---

[25] In 1968, the people of Massachusetts were asked "Shall the commonwealth . . . retain the death penalty for crime?" A substantial majority of the ballots cast answered "Yes." Of 2,348,005 ballots cast, 1,159,348 voted "Yes," 730,649 voted "No," and 458,008 were blank. See *Commonwealth* v. *O'Neal,* —— Mass. ——, ——, and n. 1, 339 N. E. 2d 676, 708, and n. 1 (1975) (Reardon, J., dissenting). A December 1972 Gallup poll indicated that 57% of the people favored the death penalty, while a June 1973 Harris survey showed support of 59%. Vidmar & Ellsworth, Public Opinion and the Death Penalty, 26 Stan. L. Rev. 1245, 1249 n. 22 (1974). In a December 1970 referendum, the voters of Illinois also rejected the abolition of capital punishment by 1,218,791 votes to 676,302 votes. Report of the Governor's Study Commission on Capital Punishment 43 (Pa. 1973).

recent decades to be more discriminating in imposing the sentence of death.[26] But the relative infrequency of jury verdicts imposing the death sentence does not indicate rejection of capital punishment *per se*. Rather, the reluctance of juries in many cases to impose the sentence may well reflect the humane feeling that this most irrevocable of sanctions should be reserved for a small number of extreme cases. See *Furman* v. *Georgia, supra,* at 388 (BURGER, C. J., dissenting). Indeed, the actions of juries in many States since *Furman* are fully compatible with the legislative judgments, reflected in the new statutes, as to the continued utility and necessity of capital punishment in appropriate cases. At the close of 1974 at least 254 persons had been sentenced to death since *Furman*,[27] and by the end of March 1976, more than 460 persons were subject to death sentences.

As we have seen, however, the Eighth Amendment demands more than that a challenged punishment be acceptable to contemporary society. The Court also must ask whether it comports with the basic concept of human dignity at the core of the Amendment. *Trop* v. *Dulles,* 356 U. S., at 100 (plurality opinion). Although we cannot "invalidate a category of penalties because we deem less severe penalties adequate to serve the ends of

---

[26] The number of prisoners who received death sentences in the years from 1961 to 1972 varied from a high of 140 in 1961 to a low of 75 in 1972, with wide fluctuations in the intervening years: 103 in 1962; 93 in 1963; 106 in 1964; 86 in 1965; 118 in 1966; 85 in 1967; 102 in 1968; 97 in 1969; 127 in 1970; and 104 in 1971. Department of Justice, National Prisoner Statistics Bulletin, Capital Punishment 1971–1972, p. 20 (Dec. 1974). It has been estimated that before *Furman* less than 20% of those convicted of murder were sentenced to death in those States that authorized capital punishment. See *Woodson* v. *North Carolina, post,* at 295–296, n. 31.

[27] Department of Justice, National Prisoner Statistics Bulletin, Capital Punishment 1974, pp. 1, 26–27 (Nov. 1975).

penology," *Furman* v. *Georgia, supra,* at 451 (POWELL, J., dissenting), the sanction imposed cannot be so totally without penological justification that it results in the gratuitous infliction of suffering. Cf. *Wilkerson* v. *Utah,* 99 U. S., at 135–136; *In re Kemmler,* 136 U. S., at 447.

The death penalty is said to serve two principal social purposes: retribution and deterrence of capital crimes by prospective offenders.[28]

In part, capital punishment is an expression of society's moral outrage at particularly offensive conduct.[29] This function may be unappealing to many, but it is essential in an ordered society that asks its citizens to rely on legal processes rather than self-help to vindicate their wrongs.

> "The instinct for retribution is part of the nature of man, and channeling that instinct in the administration of criminal justice serves an important purpose in promoting the stability of a society governed by law. When people begin to believe that organized society is unwilling or unable to impose upon criminal offenders the punishment they 'deserve,' then there are sown the seeds of anarchy—of self-help, vigilante justice, and lynch law." *Furman* v. *Georgia, supra,* at 308 (STEWART, J., concurring).

"Retribution is no longer the dominant objective of the criminal law," *Williams* v. *New York,* 337 U. S. 241, 248 (1949), but neither is it a forbidden objective nor one inconsistent with our respect for the dignity of men.

---

[28] Another purpose that has been discussed is the incapacitation of dangerous criminals and the consequent prevention of crimes that they may otherwise commit in the future. See *People* v. *Anderson,* 6 Cal. 3d 628, 651, 493 P. 2d 880, 896, cert. denied, 406 U. S. 958 (1972); *Commonwealth* v. *O'Neal, supra,* at ——, 339 N. E. 2d, at 685–686.

[29] See H. Packer, Limits of the Criminal Sanction 43–44 (1968).

*Furman* v. *Georgia,* 408 U. S., at 394–395 (BURGER, C. J., dissenting); *id.,* at 452–454 (POWELL, J., dissenting); *Powell* v. *Texas,* 392 U. S., at 531 535–536 (plurality opinion). Indeed, the decision that capital punishment may be the appropriate sanction in extreme cases is an expression of the community's belief that certain crimes are themselves so grievous an affront to humanity that the only adequate response may be the penalty of death.[30]

Statistical attempts to evaluate the worth of the death penalty as a deterrent to crimes by potential offenders have occasioned a great deal of debate.[31] The results

---

[30] Lord Justice Denning, Master of the Rolls of the Court of Appeal in England, spoke to this effect before the British Royal Commission on Capital Punishment:

"Punishment is the way in which society expresses its denunciation of wrong doing: and, in order to maintain respect for law, it is essential that the punishment inflicted for grave crimes should adequately reflect the revulsion felt by the great majority of citizens for them. It is a mistake to consider the objects of punishment as being deterrent or reformative or preventive and nothing else.... The truth is that some crimes are so outrageous that society insists on adequate punishment, because the wrong-doer deserves it, irrespective of whether it is a deterrent or not." Royal Commission on Capital Punishment, Minutes of Evidence, Dec. 1, 1949, p. 207 (1950).

A contemporary writer has noted more recently that opposition to capital punishment "has much more appeal when the discussion is merely academic than when the community is confronted with a crime, or a series of crimes, so gross, so heinous, so cold-blooded that anything short of death seems an inadequate response." Raspberry, Death Sentence, The Washington Post, Mar. 12, 1976, p. A27, cols. 5–6.

[31] See, *e. g.,* Peck, The Deterrent Effect of Capital Punishment: Ehrlich and His Critics, 85 Yale L. J. 359 (1976); Baldus & Cole, A Comparison of the Work of Thorsten Sellin and Isaac Ehrlich on the Deterrent Effect of Capital Punishment, 85 Yale L. J. 170 (1975); Bowers & Pierce, The Illusion of Deterrence in Isaac Ehrlich's Research on Capital Punishment, 85 Yale L. J. 187 (1975);

simply have been inconclusive. As one opponent of capital punishment has said:

"[A]fter all possible inquiry, including the probing of all possible methods of inquiry, we do not know, and for systematic and easily visible reasons cannot know, what the truth about this 'deterrent' effect may be . . . .

"The inescapable flaw is . . . that social conditions in any state are not constant through time, and that social conditions are not the same in any two states. If an effect were observed (and the observed effects, one way or another, are not large) then one could not at all tell whether any of this effect is attributable to the presence or absence of capital punishment. A 'scientific'—that is to say, a soundly based—conclusion is simply impossible, and no methodological path out of this tangle suggests itself." C. Black, Capital Punishment: The Inevitability of Caprice and Mistake 25–26 (1974).

Although some of the studies suggest that the death penalty may not function as a significantly greater deterrent than lesser penalties,[32] there is no convincing empirical evidence either supporting or refuting this view. We may nevertheless assume safely that there are murderers, such as those who act in passion, for whom the threat of death has little or no deterrent effect. But for many others, the death penalty undoubtedly is a signifi-

---

Ehrlich, The Deterrent Effect of Capital Punishment: A Question of Life and Death, 65 Am. Econ. Rev. 397 (June 1975); Hook, The Death Sentence, in The Death Penalty in America 146 (H. Bedau ed. 1967); T. Sellin, The Death Penalty, A Report for the Model Penal Code Project of the American Law Institute (1959).

[32] See, e. g., The Death Penalty in America, supra, at 258–332; Report of the Royal Commission on Capital Punishment, 1949–1953, Cmd. 8932.

cant deterrent. There are carefully contemplated murders, such as murder for hire, where the possible penalty of death may well enter into the cold calculus that precedes the decision to act.[33] And there are some categories of murder, such as murder by a life prisoner, where other sanctions may not be adequate.[34]

The value of capital punishment as a deterrent of crime is a complex factual issue the resolution of which properly rests with the legislatures, which can evaluate the results of statistical studies in terms of their own local conditions and with a flexibility of approach that is not available to the courts. *Furman* v. *Georgia, supra,* at 403–405 (BURGER, C. J., dissenting). Indeed, many of the post-*Furman* statutes reflect just such a responsible effort to define those crimes and those criminals for which capital punishment is most probably an effective deterrent.

In sum, we cannot say that the judgment of the Georgia Legislature that capital punishment may be necessary in some cases is clearly wrong. Considerations of federalism, as well as respect for the ability of a legislature

---

[33] Other types of calculated murders, apparently occurring with increasing frequency, include the use of bombs or other means of indiscriminate killings, the extortion murder of hostages or kidnap victims, and the execution-style killing of witnesses to a crime.

[34] We have been shown no statistics breaking down the total number of murders into the categories described above. The overall trend in the number of murders committed in the nation, however, has been upward for some time. In 1964, reported murders totaled an estimated 9,250. During the ensuing decade, the number reported increased 123%, until it totaled approximately 20,600 in 1974. In 1972, the year *Furman* was announced, the total estimated was 18,-520. Despite a fractional decrease in 1975 as compared with 1974, the number of murders increased in the three years immediately following *Furman* to approximately 20,400, an increase of almost 10%. See FBI, Uniform Crime Reports, for 1964, 1972, 1974, and 1975, Preliminary Annual Release.

to evaluate, in terms of its particular State, the moral consensus concerning the death penalty and its social utility as a sanction, require us to conclude, in the absence of more convincing evidence, that the infliction of death as a punishment for murder is not without justification and thus is not unconstitutionally severe.

Finally, we must consider whether the punishment of death is disproportionate in relation to the crime for which it is imposed. There is no question that death as a punishment is unique in its severity and irrevocability. *Furman* v. *Georgia,* 408 U. S., at 286–291 (BRENNAN, J., concurring); *id.,* at 306 (STEWART, J., concurring). When a defendant's life is at stake, the Court has been particularly sensitive to insure that every safeguard is observed. *Powell* v. *Alabama,* 287 U. S. 45, 71 (1932); *Reid* v. *Covert,* 354 U. S. 1, 77 (1957) (Harlan, J., concurring in result). But we are concerned here only with the imposition of capital punishment for the crime of murder, and when a life has been taken deliberately by the offender,[35] we cannot say that the punishment is invariably disproportionate to the crime. It is an extreme sanction, suitable to the most extreme of crimes.

We hold that the death penalty is not a form of punishment that may never be imposed, regardless of the circumstances of the offense, regardless of the character of the offender, and regardless of the procedure followed in reaching the decision to impose it.

## IV

We now consider whether Georgia may impose the death penalty on the petitioner in this case.

---

[35] We do not address here the question whether the taking of the criminal's life is a proportionate sanction where no victim has been deprived of life—for example, when capital punishment is imposed for rape, kidnaping, or armed robbery that does not result in the death of any human being.

188

## A

While *Furman* did not hold that the infliction of the death penalty *per se* violates the Constitution's ban on cruel and unusual punishments, it did recognize that the penalty of death is different in kind from any other punishment imposed under our system of criminal justice. Because of the uniqueness of the death penalty, *Furman* held that it could not be imposed under sentencing procedures that created a substantial risk that it would be inflicted in an arbitrary and capricious manner. MR. JUSTICE WHITE concluded that "the death penalty is exacted with great infrequency even for the most atrocious crimes and . . . there is no meaningful basis for distinguishing the few cases in which it is imposed from the many cases in which it is not." 408 U. S., at 313 (concurring). Indeed, the death sentences examined by the Court in *Furman* were "cruel and unusual in the same way that being struck by lightning is cruel and unusual. For, of all the people convicted of [capital crimes], many just as reprehensible as these, the petitioners [in *Furman* were] among a capriciously selected random handful upon whom the sentence of death has in fact been imposed. . . . [T]he Eighth and Fourteenth Amendments cannot tolerate the infliction of a sentence of death under legal systems that permit this unique penalty to be so wantonly and so freakishly imposed." *Id.*, at 309–310 (STEWART, J., concurring).[36]

---

[36] This view was expressed by other Members of the Court who concurred in the judgments. See 408 U. S., at 255–257 (Douglas, J.); *id.*, at 291–295 (BRENNAN, J.). The dissenters viewed this concern as the basis for the *Furman* decision: "The decisive grievance of the opinions . . . is that the present system of discretionary sentencing in capital cases has failed to produce evenhanded justice; . . . that the selection process has followed no rational pattern." *Id.*, at 398–399 (BURGER, C. J., dissenting).

*Furman* mandates that where discretion is afforded a sentencing body on a matter so grave as the determination of whether a human life should be taken or spared, that discretion must be suitably directed and limited so as to minimize the risk of wholly arbitrary and capricious action.

It is certainly not a novel proposition that discretion in the area of sentencing be exercised in an informed manner. We have long recognized that "[f]or the determination of sentences, justice generally requires . . . that there be taken into account the circumstances of the offense together with the character and propensities of the offender." *Pennsylvania ex rel. Sullivan* v. *Ashe,* 302 U. S. 51, 55 (1937). See also *Williams* v. *Oklahoma,* 358 U. S. 576, 585 (1959); *Williams* v. *New York,* 337 U. S., at 247.[37] Otherwise, "the system cannot function in a consistent and a rational manner." American Bar Association Project on Standards for Criminal Justice, Sentencing Alternatives and Procedures § 4.1 (a), Commentary, p. 201 (App. Draft 1968). See also President's Commission on Law Enforcement and Administration of Justice, The Challenge of Crime in a Free Society 144 (1967); ALI, Model Penal Code § 7.07, Comment 1, pp. 52–53 (Tent. Draft No. 2, 1954).[38]

---

[37] The Federal Rules of Criminal Procedure require as a matter of course that a presentence report containing information about a defendant's background be prepared for use by the sentencing judge. Rule 32 (c). The importance of obtaining accurate sentencing information is underscored by the Rule's direction to the sentencing court to "afford the defendant or his counsel an opportunity to comment [on the report] and, at the discretion of the court, to introduce testimony or other information relating to any alleged factual inaccuracy contained in the presentence report." Rule 32 (c)(3)(A).

[38] Indeed, we hold elsewhere today that in capital cases it is constitutionally required that the sentencing authority have information

The cited studies assumed that the trial judge would be the sentencing authority. If an experienced trial judge, who daily faces the difficult task of imposing sentences, has a vital need for accurate information about a defendant and the crime he committed in order to be able to impose a rational sentence in the typical criminal case, then accurate sentencing information is an indispensable prerequisite to a reasoned determination of whether a defendant shall live or die by a jury of people who may never before have made a sentencing decision.

Jury sentencing has been considered desirable in capital cases in order "to maintain a link between contemporary community values and the penal system—a link without which the determination of punishment could hardly reflect 'the evolving standards of decency that mark the progress of a maturing society.' " [39] But it creates special problems. Much of the information that is relevant to the sentencing decision may have no relevance to the question of guilt, or may even be extremely prejudicial to a fair determination of that question.[40] This problem, however, is scarcely insurmountable. Those who have studied the question suggest that a bifurcated procedure—one in which the

sufficient to enable it to consider the character and individual circumstances of a defendant prior to imposition of a death sentence. See *Woodson* v. *North Carolina, post,* at 303–305.

[39] *Witherspoon* v. *Illinois,* 391 U. S., at 519 n. 15, quoting *Trop* v. *Dulles,* 356 U. S., at 101 (plurality opinion). See also Report of the Royal Commission on Capital Punishment, 1949–1953, Cmd. 8932, ¶ 571.

[40] In other situations this Court has concluded that a jury cannot be expected to consider certain evidence before it on one issue, but not another. See, *e. g., Bruton* v. *United States,* 391 U. S. 123 (1968); *Jackson* v. *Denno,* 378 U. S. 368 (1964).

question of sentence is not considered until the determination of guilt has been made—is the best answer. The drafters of the Model Penal Code concluded:

"[If a unitary proceeding is used] the determination of the punishment must be based on less than all the evidence that has a bearing on that issue, such for example as a previous criminal record of the accused, or evidence must be admitted on the ground that it is relevant to sentence, though it would be excluded as irrelevant or prejudicial with respect to guilt or innocence alone. Trial lawyers understandably have little confidence in a solution that admits the evidence and trusts to an instruction to the jury that it should be considered only in determining the penalty and disregarded in assessing guilt.

". . . The obvious solution . . . is to bifurcate the proceeding, abiding strictly by the rules of evidence until and unless there is a conviction, but once guilt has been determined opening the record to the further information that is relevant to sentence. This is the analogue of the procedure in the ordinary case when capital punishment is not in issue; the court conducts a separate inquiry before imposing sentence." ALI, Model Penal Code § 201.6, Comment 5, pp. 74–75 (Tent. Draft No. 9, 1959).

See also *Spencer* v. *Texas,* 385 U. S. 554, 567–569 (1967); Report of the Royal Commission on Capital Punishment, 1949–1953, Cmd. 8932, ¶¶ 555, 574; Knowlton, Problems of Jury Discretion in Capital Cases, 101 U. Pa. L. Rev. 1099, 1135–1136 (1953). When a human life is at stake and when the jury must have information prejudicial to the question of guilt but relevant to the question of penalty in order to impose a rational sentence, a bifur-

cated system is more likely to ensure elimination of the constitutional deficiencies identified in *Furman*.[41]

But the provision of relevant information under fair procedural rules is not alone sufficient to guarantee that the information will be properly used in the imposition of punishment, especially if sentencing is performed by a jury. Since the members of a jury will have had little, if any, previous experience in sentencing, they are unlikely to be skilled in dealing with the information they are given. See American Bar Association Project on Standards for Criminal Justice, Sentencing Alternatives and Procedures, § 1.1 (b), Commentary, pp. 46–47 (Approved Draft 1968); President's Commission on Law Enforcement and Administration of Justice: The Challenge of Crime in a Free Society, Task Force Report: The Courts 26 (1967). To the extent that this problem is inherent in jury sentencing, it may not be totally correctible. It seems clear, however, that the problem will be alleviated if the jury is given guidance regarding the factors about the crime and the defendant that the State, representing organized society, deems particularly relevant to the sentencing decision.

The idea that a jury should be given guidance in its

---

[41] In *United States* v. *Jackson*, 390 U. S. 570 (1968), the Court considered a statute that provided that if a defendant pleaded guilty, the maximum penalty would be life imprisonment, but if a defendant chose to go to trial, the maximum penalty upon conviction was death. In holding that the statute was constitutionally invalid, the Court noted:

"The inevitable effect of any such provision is, of course, to discourage assertion of the Fifth Amendment right not to plead guilty and to deter exercise of the Sixth Amendment right to demand a jury trial. If the provision had no other purpose or effect than to chill the assertion of constitutional rights by penalizing those who choose to exercise them, then it would be patently unconstitutional." *Id.*, at 581.

decisionmaking is also hardly a novel proposition. Juries are invariably given careful instructions on the law and how to apply it before they are authorized to decide the merits of a lawsuit. It would be virtually unthinkable to follow any other course in a legal system that has traditionally operated by following prior precedents and fixed rules of law.[42] See *Gasoline Products Co. v. Champlin Refining Co.*, 283 U. S. 494, 498 (1931); Fed. Rule Civ. Proc. 51. When erroneous instructions are given, retrial is often required. It is quite simply a hallmark of our legal system that juries be carefully and adequately guided in their deliberations.

While some have suggested that standards to guide a capital jury's sentencing deliberations are impossible to formulate,[43] the fact is that such standards have been developed. When the drafters of the Model Penal Code faced this problem, they concluded "that it is within the realm of possibility to point to the main circumstances of aggravation and of mitigation that should be weighed *and weighed against each other* when they are presented in a concrete case." ALI, Model Penal Code § 201.6, Comment 3, p. 71 (Tent. Draft No. 9, 1959) (emphasis in original).[44] While such standards are by

---

[42] But see Md. Const., Art. XV, § 5: "In the trial of all criminal cases, the jury shall be the Judges of the Law, as well as of fact . . . ." See also Md. Code Ann., art. 27, § 593 (1971). Maryland judges, however, typically give advisory instructions on the law to the jury. See Md. Rule 756; *Wilson* v. *State*, 239 Md. 245, 210 A. 2d 824 (1965).

[43] See *McGautha* v. *California*, 402 U. S., at 204–207; Report of the Royal Commission on Capital Punishment, 1949–1953, Cmd. 8932, ¶ 595.

[44] The Model Penal Code proposes the following standards:

"(3) Aggravating Circumstances.

"(a) The murder was committed by a convict under sentence of imprisonment.

necessity somewhat general, they do provide guidance to the sentencing authority and thereby reduce the likelihood that it will impose a sentence that fairly can be

---

"(b) The defendant was previously convicted of another murder or of a felony involving the use or threat of violence to the person.

"(c) At the time the murder was committed the defendant also committed another murder.

"(d) The defendant knowingly created a great risk of death to many persons.

"(e) The murder was committed while the defendant was engaged or was an accomplice in the commission of, or an attempt to commit, or flight after committing or attempting to commit robbery, rape or deviate sexual intercourse by force or threat of force, arson, burglary or kidnapping.

"(f) The murder was committed for the purpose of avoiding or preventing a lawful arrest or effecting an escape from lawful custody.

"(g) The murder was committed for pecuniary gain.

"(h) The murder was especially heinous, atrocious or cruel, manifesting exceptional depravity.

"(4) Mitigating Circumstances.

"(a) The defendant has no significant history of prior criminal activity.

"(b) The murder was committed while the defendant was under the influence of extreme mental or emotional disturbance.

"(c) The victim was a participant in the defendant's homicidal conduct or consented to the homicidal act.

"(d) The murder was committed under circumstances which the defendant believed to provide a moral justification or extenuation for his conduct.

"(e) The defendant was an accomplice in a murder committed by another person and his participation in the homicidal act was relatively minor.

"(f) The defendant acted under duress or under the domination of another person.

"(g) At the time of the murder, the capacity of the defendant to appreciate the criminality [wrongfulness] of his conduct or to conform his conduct to the requirements of law was impaired as a result of mental disease or defect or intoxication.

"(h) The youth of the defendant at the time of the crime." ALI Model Penal Code § 210.6 (Proposed Official Draft 1962).

called capricious or arbitrary.[45]   Where the sentencing
authority is required to specify the factors it relied upon
in reaching its decision, the further safeguard of mean-
ingful appellate review is available to ensure that death
sentences are not imposed capriciously or in a freakish
manner.

In summary, the concerns expressed in *Furman* that
the penalty of death not be imposed in an arbitrary or
capricious manner can be met by a carefully drafted stat-
ute that ensures that the sentencing authority is given
adequate information and guidance.   As a general propo-
sition these concerns are best met by a system that pro-
vides for a bifurcated proceeding at which the sentencing
authority is apprised of the information relevant to the
imposition of sentence and provided with standards to
guide its use of the information.

We do not intend to suggest that only the above-
described procedures would be permissible under *Furman*
or that any sentencing system constructed along these
general lines would inevitably satisfy the concerns of
*Furman*,[46] for each distinct system must be examined on
an individual basis.   Rather, we have embarked upon
this general exposition to make clear that it is possible to
construct capital-sentencing systems capable of meeting
*Furman*'s constitutional concerns.[47]

---

[45] As MR. JUSTICE BRENNAN noted in *McGautha* v. *California,*
*supra,* at 285–286 (dissenting opinion):

"[E]ven if a State's notion of wise capital sentencing policy is such
that the policy cannot be implemented through a formula capable
of mechanical application . . . there is no reason that it should not
give some guidance to those called upon to render decision."

[46] A system could have standards so vague that they would fail ade-
quately to channel the sentencing decision patterns of juries with
the result that a pattern of arbitrary and capricious sentencing like
that found unconstitutional in *Furman* could occur.

[47] In *McGautha* v. *California, supra,* this Court held that the

## B

We now turn to consideration of the constitutionality of Georgia's capital-sentencing procedures. In the wake of *Furman,* Georgia amended its capital punishment statute, but chose not to narrow the scope of its murder provisions. See Part II, *supra.* Thus, now as before *Furman,* in Georgia "[a] person commits murder when he unlawfully and with malice aforethought, either express or implied, causes the death of another human being." Ga. Code Ann., § 26–1101 (a) (1972). All persons convicted of murder "shall be punished by death or by imprisonment for life." § 26–1101 (c) (1972).

Georgia did act, however, to narrow the class of murderers subject to capital punishment by specifying 10

Due Process Clause of the Fourteenth Amendment did not require that a jury be provided with standards to guide its decision whether to recommend a sentence of life imprisonment or death or that the capital-sentencing proceeding be separated from the guilt-determination process. *McGautha* was not an Eighth Amendment decision, and to the extent it purported to deal with Eighth Amendment concerns, it must be read in light of the opinions in *Furman* v. *Georgia.* There the Court ruled that death sentences imposed under statutes that left juries with untrammeled discretion to impose or withhold the death penalty violated the Eighth and Fourteenth Amendments. While *Furman* did not overrule *McGautha,* it is clearly in substantial tension with a broad reading of *McGautha's* holding. In view of *Furman, McGautha* can be viewed rationally as a precedent only for the proposition that standardless jury sentencing procedures were not employed in the cases there before the Court so as to violate the Due Process Clause. We note that *McGautha's* assumption that it is not possible to devise standards to guide and regularize jury sentencing in capital cases has been undermined by subsequent experience. In view of that experience and the considerations set forth in the text, we adhere to *Furman's* determination that where the ultimate punishment of death is at issue a system of standardless jury discretion violates the Eighth and Fourteenth Amendments.

statutory aggravating circumstances, one of which must be found by the jury to exist beyond a reasonable doubt before a death sentence can ever be imposed.[48]  In addition, the jury is authorized to consider any other appropriate aggravating or mitigating circumstances. § 27-2534.1 (b) (Supp. 1975).  The jury is not required to find any mitigating circumstance in order to make a recommendation of mercy that is binding on the trial court, see § 27-2302 (Supp. 1975), but it must find a *statutory* aggravating circumstance before recommending a sentence of death.

These procedures require the jury to consider the circumstances of the crime and the criminal before it recommends sentence.  No longer can a Georgia jury do as Furman's jury did: reach a finding of the defendant's guilt and then, without guidance or direction, decide whether he should live or die.  Instead, the jury's attention is directed to the specific circumstances of the crime: Was it committed in the course of another capital felony?  Was it committed for money?  Was it committed upon a peace officer or judicial officer?  Was it committed in a particularly heinous way or in a manner that endangered the lives of many persons?  In addition, the jury's attention is focused on the characteristics of the person who committed the crime: Does he have a record of prior convictions for capital offenses?  Are there any special facts about this defendant that mitigate against imposing capital punishment (*e. g.,* his youth, the extent of his cooperation with the police, his emotional state at the time of the crime).[49]  As a result, while

---

[48] The text of the statute enumerating the various aggravating circumstances is set out at n. 9, *supra*.

[49] See *Moore* v. *State,* 233 Ga. 861, 865, 213 S. E. 2d 829, 832 (1975).

some jury discretion still exists, "the discretion to be exercised is controlled by clear and objective standards so as to produce non-discriminatory application." *Coley* v. *State,* 231 Ga. 829, 834, 204 S. E. 2d 612, 615 (1974).

As an important additional safeguard against arbitrariness and caprice, the Georgia statutory scheme provides for automatic appeal of all death sentences to the State's Supreme Court. That court is required by statute to review each sentence of death and determine whether it was imposed under the influence of passion or prejudice, whether the evidence supports the jury's finding of a statutory aggravating circumstance, and whether the sentence is disproportionate compared to those sentences imposed in similar cases. § 27–2537 (c) (Supp. 1975).

In short, Georgia's new sentencing procedures require as a prerequisite to the imposition of the death penalty, specific jury findings as to the circumstances of the crime or the character of the defendant. Moreover, to guard further against a situation comparable to that presented in *Furman,* the Supreme Court of Georgia compares each death sentence with the sentences imposed on similarly situated defendants to ensure that the sentence of death in a particular case is not disproportionate. On their face these procedures seem to satisfy the concerns of *Furman.* No longer should there be "no meaningful basis for distinguishing the few cases in which [the death penalty] is imposed from the many cases in which it is not." 408 U. S., at 313 (WHITE, J., concurring).

The petitioner contends, however, that the changes in the Georgia sentencing procedures are only cosmetic, that the arbitrariness and capriciousness condemned by *Furman* continue to exist in Georgia—both in traditional practices that still remain and in the new sentencing procedures adopted in response to *Furman.*

## 1

First, the petitioner focuses on the opportunities for discretionary action that are inherent in the processing of any murder case under Georgia law. He notes that the state prosecutor has unfettered authority to select those persons whom he wishes to prosecute for a capital offense and to plea bargain with them. Further, at the trial the jury may choose to convict a defendant of a lesser included offense rather than find him guilty of a crime punishable by death, even if the evidence would support a capital verdict. And finally, a defendant who is convicted and sentenced to die may have his sentence commuted by the Governor of the State and the Georgia Board of Pardons and Paroles.

The existence of these discretionary stages is not determinative of the issues before us. At each of these stages an actor in the criminal justice system makes a decision which may remove a defendant from consideration as a candidate for the death penalty. *Furman*, in contrast, dealt with the decision to impose the death sentence on a specific individual who had been convicted of a capital offense. Nothing in any of our cases suggests that the decision to afford an individual defendant mercy violates the Constitution. *Furman* held only that, in order to minimize the risk that the death penalty would be imposed on a capriciously selected group of offenders, the decision to impose it had to be guided by standards so that the sentencing authority would focus on the particularized circumstances of the crime and the defendant.[50]

---

[50] The petitioner's argument is nothing more than a veiled contention that *Furman* indirectly outlawed capital punishment by placing totally unrealistic conditions on its use. In order to repair the alleged defects pointed to by the petitioner, it would be necessary to require that prosecuting authorities charge a capital offense whenever arguably there had been a capital murder and that they

## 2

The petitioner further contends that the capital-sentencing procedures adopted by Georgia in response to *Furman* do not eliminate the dangers of arbitrariness and caprice in jury sentencing that were held in *Furman* to be violative of the Eighth and Fourteenth Amendments. He claims that the statute is so broad and vague as to leave juries free to act as arbitrarily and capriciously as they wish in deciding whether to impose the death penalty. While there is no claim that the jury in this case relied upon a vague or overbroad provision to establish the existence of a statutory aggravating circumstance, the petitioner looks to the sentencing system as a whole (as the Court did in *Furman* and we do today) and argues that it fails to reduce sufficiently the risk of arbitrary infliction of death sentences. Specifically, Gregg urges that the statutory aggravating circumstances are too broad and too vague, that the sentencing procedure allows for arbitrary grants of mercy, and that the scope of the evidence and argument that can be considered at the presentence hearing is too wide.

---

refuse to plea bargain with the defendant. If a jury refused to convict even though the evidence supported the charge, its verdict would have to be reversed and a verdict of guilty entered or a new trial ordered, since the discretionary act of jury nullification would not be permitted. Finally, acts of executive clemency would have to be prohibited. Such a system, of course, would be totally alien to our notions of criminal justice.

Moreover, it would be unconstitutional. Such a system in many respects would have the vices of the mandatory death penalty statutes we hold unconstitutional today in *Woodson* v. *North Carolina, post,* p. 280, and *Roberts* v. *Louisiana, post,* p. 325. The suggestion that a jury's verdict of acquittal could be overturned and a defendant retried would run afoul of the Sixth Amendment jury-trial guarantee and the Double Jeopardy Clause of the Fifth Amendment. In the federal system it also would be unconstitutional to prohibit a President from deciding, as an act of executive clemency, to reprieve one sentenced to death. U. S. Const., Art. II, § 2.

The petitioner attacks the seventh statutory aggravating circumstance, which authorizes imposition of the death penalty if the murder was "outrageously or wantonly vile, horrible or inhuman in that it involved torture, depravity of mind, or an aggravated battery to the victim," contending that it is so broad that capital punishment could be imposed in any murder case.[51] It is, of course, arguable that any murder involves depravity of mind or an aggravated battery. But this language need not be construed in this way, and there is no reason to assume that the Supreme Court of Georgia will adopt such an open-ended construction.[52] In only one case has it upheld a jury's decision to sentence a defendant to death when the only statutory aggravating circumstance found was that of the seventh, see *McCorquodale* v. *State*, 233 Ga. 369, 211 S. E. 2d 577 (1974), and that homicide was a horrifying torture-murder.[53]

---

[51] In light of the limited grant of certiorari, see *supra*, at 162, we review the "vagueness" and "overbreadth" of the statutory aggravating circumstances only to consider whether their imprecision renders this capital-sentencing system invalid under the Eighth and Fourteenth Amendments because it is incapable of imposing capital punishment other than by arbitrariness or caprice.

[52] In the course of interpreting Florida's new capital-sentencing statute, the Supreme Court of Florida has ruled that the phrase "especially heinous, atrocious or cruel" means a "conscienceless or pitiless crime which is unnecessarily torturous to the victim." *State* v. *Dixon*, 283 So. 2d 1, 9 (1973). See *Proffitt* v. *Florida, post,* at 255–256.

[53] Two other reported cases indicate that juries have found aggravating circumstances based on § 27–2534.1 (b)(7). In both cases a separate statutory aggravating circumstance was also found, and the Supreme Court of Georgia did not explicitly rely on the finding of the seventh circumstance when it upheld the death sentence. See *Jarrell* v. *State*, 234 Ga. 410, 216 S. E. 2d 258 (1975) (State Supreme Court upheld finding that defendant committed two other capital felonies—kidnaping and armed robbery—in the course of

202

The petitioner also argues that two of the statutory aggravating circumstances are vague and therefore susceptible of widely differing interpretations, thus creating a substantial risk that the death penalty will be arbitrarily inflicted by Georgia juries.[54] In light of the decisions of the Supreme Court of Georgia we must disagree. First, the petitioner attacks that part of § 27–2534.1 (b) (1) that authorizes a jury to consider whether a defendant has a "substantial history of serious assaultive criminal convictions." The Supreme Court of Georgia, however, has demonstrated a concern that the new sentencing procedures provide guidance to juries. It held this provision to be impermissibly vague in *Arnold* v. *State*, 236 Ga. 534, 540, 224 S. E. 2d 386, 391 (1976), because it did not provide the jury with "sufficiently 'clear and objective standards.' " Second, the petitioner points to § 27–2534.1 (b) (3) which speaks of creating a "great risk of death to more than one person." While such a phrase might be susceptible of an overly broad interpretation, the Supreme Court of Georgia has not so construed it. The only case in which the court upheld a conviction in reliance on this aggravating circumstance involved a man who stood up in a church and fired a gun indiscriminately into the audience. See

the murder, § 27–2534.1 (b) (2); jury also found that the murder was committed for money, § 27–2534.1 (b) (4), and that a great risk of death to bystanders was created, § 27–2534.1 (b) (3)); *Floyd* v. *State*, 233 Ga. 280, 210 S. E. 2d 810 (1974) (found to have committed a capital felony—armed robbery—in the course of the murder, § 27–2534.1 (b) (2)).

[54] The petitioner also attacks § 25–2534.1 (b) (7) as vague. As we have noted in answering his overbreadth argument concerning this section, however, the state court has not given a broad reading to the scope of this provision, and there is no reason to think that juries will not be able to understand it. See n. 51, *supra; Proffitt* v. *Florida, post,* at 255–256.

*Chenault* v. *State,* 234 Ga. 216, 215 S. E. 2d 223 (1975). On the other hand, the court expressly reversed a finding of great risk when the victim was simply kidnaped in a parking lot. See *Jarrell* v. *State,* 234 Ga. 410, 424, 216 S. E. 2d 258, 269 (1975).[55]

The petitioner next argues that the requirements of *Furman* are not met here because the jury has the power to decline to impose the death penalty even if it finds that one or more statutory aggravating circumstances are present in the case. This contention misinterprets *Furman.* See *supra,* at 198–199. Moreover, it ignores the role of the Supreme Court of Georgia which reviews each death sentence to determine whether it is proportional to other sentences imposed for similar crimes. Since the proportionality requirement on review is intended to prevent caprice in the decision to inflict the penalty, the isolated decision of a jury to afford mercy does not render unconstitutional death sentences imposed on defendants who were sentenced under a system that does not create a substantial risk of arbitrariness or caprice.

The petitioner objects, finally, to the wide scope of evidence and argument allowed at presentence hearings. We think that the Georgia court wisely has chosen not to impose unnecessary restrictions on the evidence that can be offered at such a hearing and to approve open and far-ranging argument. See, *e. g., Brown* v. *State,* 235 Ga. 644, 220 S. E. 2d 922 (1975). So long as the

---

[55] The petitioner also objects to the last part of § 27–2534.1 (b) (3) which requires that the great risk be created "by means of a weapon or device which would normally be hazardous to the lives of more than one person." While the state court has not focused on this section, it seems reasonable to assume that if a great risk in fact is created, it will be likely that a weapon or device normally hazardous to more than one person will have created it.

evidence introduced and the arguments made at the presentence hearing do not prejudice a defendant, it is preferable not to impose restrictions. We think it desirable for the jury to have as much information before it as possible when it makes the sentencing decision. See *supra,* at 189–190.

### 3

Finally, the Georgia statute has an additional provision designed to assure that the death penalty will not be imposed on a capriciously selected group of convicted defendants. The new sentencing procedures require that the State Supreme Court review every death sentence to determine whether it was imposed under the influence of passion, prejudice, or any other arbitrary factor, whether the evidence supports the findings of a statutory aggravating circumstance, and "[w]hether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant." § 27–2537 (c)(3) (Supp. 1975).[56] In per-

---

[56] The court is required to specify in its opinion the similar cases which it took into consideration. § 27–2537 (e) (Supp. 1975). Special provision is made for staff to enable the court to compile data relevant to its consideration of the sentence's validity. §§ 27–2537 (f)–(h) (Supp. 1975). See generally *supra,* at 166–168.

The petitioner claims that this procedure has resulted in an inadequate basis for measuring the proportionality of sentences. First, he notes that nonappealed capital convictions where a life sentence is imposed and cases involving homicides where a capital conviction is not obtained are not included in the group of cases which the Supreme Court of Georgia uses for comparative purposes. The Georgia court has the authority to consider such cases, see *Ross* v. *State,* 233 Ga. 361, 365–366, 211 S. E. 2d 356, 359 (1974), and it does consider appealed murder cases where a life sentence has been imposed. We do not think that the petitioner's argument establishes that the Georgia court's review process is ineffective. The petitioner further complains about the Georgia court's current practice of using some pre-*Furman* cases in its comparative examination. This prac-

forming its sentence-review function, the Georgia court has held that "if the death penalty is only rarely imposed for an act or it is substantially out of line with sentences imposed for other acts it will be set aside as excessive." *Coley* v. *State,* 231 Ga., at 834, 204 S. E. 2d, at 616. The court on another occasion stated that "we view it to be our duty under the similarity standard to assure that no death sentence is affirmed unless in similar cases throughout the state the death penalty has been imposed generally . . . ." *Moore* v. *State,* 233 Ga. 861, 864, 213 S. E. 2d 829, 832 (1975). See also *Jarrell* v. *State, supra,* at 425, 216 S. E. 2d, at 270 (standard is whether "juries generally throughout the state have imposed the death penalty"); *Smith* v. *State,* 236 Ga. 12, 24, 222 S. E. 2d 308, 318 (1976) (found "a clear pattern" of jury behavior).

It is apparent that the Supreme Court of Georgia has taken its review responsibilities seriously. In *Coley,* it held that "[t]he prior cases indicate that the past practice among juries faced with similar factual situations and like aggravating circumstances has been to impose only the sentence of life imprisonment for the offense of rape, rather than death." 231 Ga., at 835, 204 S. E. 2d, at 617. It thereupon reduced Coley's sentence from death to life imprisonment. Similarly, although armed robbery is a capital offense under Georgia law, § 26–1902 (1972), the Georgia court concluded that the death sentences imposed in this case for that crime were "unusual in that they are rarely imposed for [armed robbery]. Thus, under the test provided by statute, . . . they must be considered to be excessive or disproportionate to the penalties imposed in similar cases." 233

tice was necessary at the inception of the new procedure in the absence of any post-*Furman* capital cases available for comparison. It is not unconstitutional.

Ga., at 127, 210 S. E. 2d, at 667. The court therefore vacated Gregg's death sentences for armed robbery and has followed a similar course in every other armed robbery death penalty case to come before it. See *Floyd* v. *State,* 233 Ga. 280, 285, 210 S. E. 2d 810, 814 (1974); *Jarrell* v. *State,* 234 Ga., at 424–425, 216 S. E. 2d, at 270. See *Dorsey* v. *State,* 236 Ga. 591, 225 S. E. 2d 418 (1976).

The provision for appellate review in the Georgia capital-sentencing system serves as a check against the random or arbitrary imposition of the death penalty. In particular, the proportionality review substantially eliminates the possibility that a person will be sentenced to die by the action of an aberrant jury. If a time comes when juries generally do not impose the death sentence in a certain kind of murder case, the appellate review procedures assure that no defendant convicted under such circumstances will suffer a sentence of death.

V

The basic concern of *Furman* centered on those defendants who were being condemned to death capriciously and arbitrarily. Under the procedures before the Court in that case, sentencing authorities were not directed to give attention to the nature or circumstances of the crime committed or to the character or record of the defendant. Left unguided, juries imposed the death sentence in a way that could only be called freakish. The new Georgia sentencing procedures, by contrast, focus the jury's attention on the particularized nature of the crime and the particularized characteristics of the individual defendant. While the jury is permitted to consider any aggravating or mitigating circumstances, it must find and identify at least one statutory aggravating factor before it may impose a penalty of death. In this way the jury's discretion is channeled. No longer

can a jury wantonly and freakishly impose the death sentence; it is always circumscribed by the legislative guidelines. In addition, the review function of the Supreme Court of Georgia affords additional assurance that the concerns that prompted our decision in *Furman* are not present to any significant degree in the Georgia procedure applied here.

For the reasons expressed in this opinion, we hold that the statutory system under which Gregg was sentenced to death does not violate the Constitution. Accordingly, the judgment of the Georgia Supreme Court is affirmed.

*It is so ordered.*

MR. JUSTICE WHITE, with whom THE CHIEF JUSTICE and MR. JUSTICE REHNQUIST join, concurring in the judgment.

In *Furman* v. *Georgia,* 408 U. S. 238 (1972), this Court held the death penalty as then administered in Georgia to be unconstitutional. That same year the Georgia Legislature enacted a new statutory scheme under which the death penalty may be imposed for several offenses, including murder. The issue in this case is whether the death penalty imposed for murder on petitioner Gregg under the new Georgia statutory scheme may constitutionally be carried out. I agree that it may.

I

Under the new Georgia statutory scheme a person convicted of murder may receive a sentence either of death or of life imprisonment. Ga. Code Ann. § 26–1101 (1972).[1] Under Georgia Code Ann. § 26–3102 (Supp.

---

[1] Section 26–1101 provides as follows:

"Murder.

"(a) A person commits murder when he unlawfully and with malice aforethought, either express or implied, causes the death

1975), the sentence will be life imprisonment unless the jury at a separate evidentiary proceeding immediately following the verdict finds unanimously and beyond a reasonable doubt at least one statutorily defined "aggravating circumstance."[2] The aggravating circumstances are:

"(1) The offense of murder, rape, armed robbery,

---

of another human being. Express malice is that deliberate intention unlawfully to take away the life of a fellow creature, which is manifested by external circumstances capable of proof. Malice shall be implied where no considerable provocation appears, and where all the circumstances of the killing show an abandoned and malignant heart.

"(b) A person also commits the crime of murder when in the commission of a felony he causes the death of another human being, irrespective of malice.

"(c) A person convicted of murder shall be punished by death or by imprisonment for life."

The death penalty may also be imposed for kidnaping, Ga. Code Ann. § 26–1311; armed robbery, § 26–1902; rape, § 26–2001; treason, § 26–2201; and aircraft hijacking, § 26–3301.

[2] Section 26–3102 (Supp. 1975) provides:

"Capital offenses; jury verdict and sentence.

"Where, upon a trial by jury, a person is convicted of an offense which may be punishable by death, a sentence of death shall not be imposed unless the jury verdict includes a finding of at least one statutory aggravating circumstance and a recommendation that such sentence be imposed. Where a statutory aggravating circumstance is found and a recommendation of death is made, the court shall sentence the defendant to death. Where a sentence of death is not recommended by the jury, the court shall sentence the defendant to imprisonment as provided by law. Unless the jury trying the case makes a finding of at least one statutory aggravating circumstance and recommends the death sentence in its verdict, the court shall not sentence the defendant to death, provided that no such finding of statutory aggravating circumstance shall be necessary in offenses of treason or aircraft hijacking. The provisions of this section shall not affect a sentence when the

or kidnapping was committed by a person with a prior record of conviction for a capital felony, or the offense of murder was committed by a person

case is tried without a jury or when the judge accepts a plea of guilty."

Georgia Laws, 1973, Act No. 74, p. 162, provides:

"At the conclusion of all felony cases heard by a jury, and after argument of counsel and proper charge from the court, the jury shall retire to consider a verdict of guilty or not guilty without any consideration of punishment. In non-jury felony cases, the judge shall likewise first consider a finding of guilty or not guilty without any consideration of punishment. Where the jury or judge returns a verdict or finding of guilty, the court shall resume the trial and conduct a pre-sentence hearing before the jury or judge at which time the only issue shall be the determination of punishment to be imposed. In such hearing, subject to the laws of evidence, the jury or judge shall hear additional evidence in extenuation, mitigation, and aggravation of punishment, including the record of any prior criminal convictions and pleas of guilty or pleas of *nolo contendere* of the defendant, or the absence of any such prior criminal convictions and pleas; provided, however, that only such evidence in aggravation as the State has made known to the defendant prior to his trial shall be admissible. The jury or judge shall also hear argument by the defendant or his counsel and the prosecuting attorney, as provided by law, regarding the punishment to be imposed. The prosecuting attorney shall open and the defendant shall conclude the argument to the jury or judge. Upon the conclusion of the evidence and arguments, the judge shall give the jury appropriate instructions and the jury shall retire to determine the punishment to be imposed. In cases in which the death penalty may be imposed by a jury or judge sitting without a jury, the additional procedure provided in Code section 27–2534.1 shall be followed. The jury, or the judge in cases tried by a judge, shall fix a sentence within the limits prescribed by law. The judge shall impose the sentence fixed by the jury or judge, as provided by law. If the jury cannot, within a reasonable time, agree to the punishment, the judge shall impose sentence within the limits of the law; provided, however, that the judge shall in no instance impose the death penalty when, in cases tried by a jury, the jury cannot agree upon the punishment. If the trial court is reversed on appeal be-

who has a substantial history of serious assaultive criminal convictions.

"(2) The offense of murder, rape, armed robbery, or kidnapping was committed while the offender was engaged in the commission of another capital felony or aggravated battery, or the offense of murder was committed while the offender was engaged in the commission of burglary or arson in the first degree.

"(3) The offender by his act of murder, armed robbery, or kidnapping knowingly created a great risk of death to more than one person in a public place by means of a weapon or device which would normally be hazardous to the lives of more than one person.

"(4) The offender committed the offense of murder for himself or another, for the purpose of receiving money or any other thing of monetary value.

"(5) The murder of a judicial officer, former judicial officer, district attorney or solicitor or former district attorney or solicitor during or because of the exercise of his official duty.

"(6) The offender caused or directed another to commit murder or committed murder as an agent or employee of another person.

"(7) The offense of murder, rape, armed robbery, or kidnapping was outrageously or wantonly vile, horrible or inhuman in that it involved torture, depravity of mind, or an aggravated battery to the victim.

"(8) The offense of murder was committed against any peace officer, corrections employee or fireman while engaged in the performance of his official duties.

---

cause of error only in the pre-sentence hearing, the new trial which may be ordered shall apply only to the issue of punishment."

"(9) The offense of murder was committed by a person in, or who has escaped from, the lawful custody of a peace officer or place of lawful confinement.

"(10) The murder was committed for the purpose of avoiding, interfering with, or preventing a lawful arrest or custody in a place of lawful confinement, of himself or another." § 27–2534.1 (b) (Supp. 1975).

Having found an aggravating circumstance, however, the jury is not required to impose the death penalty. Instead, it is merely authorized to impose it after considering evidence of "any mitigating circumstances or aggravating circumstances otherwise authorized by law and any of the [enumerated] statutory aggravating circumstances . . . ." § 27–2534.1 (b) (Supp. 1975). Unless the jury unanimously determines that the death penalty should be imposed, the defendant will be sentenced to life imprisonment. In the event that the jury does impose the death penalty, it must designate in writing the aggravating circumstance which it found to exist beyond a reasonable doubt.

An important aspect of the new Georgia legislative scheme, however, is its provision for appellate review. Prompt review by the Georgia Supreme Court is provided for in every case in which the death penalty is imposed. To assist it in deciding whether to sustain the death penalty, the Georgia Supreme Court is supplied, in every case, with a report from the trial judge in the form of a standard questionnaire. § 27–2537 (a) (Supp. 1975). The questionnaire contains, *inter alia,* six questions designed to disclose whether race played a role in the case and one question asking the trial judge whether the evidence forecloses "all doubt respecting the defend-

ant's guilt." In deciding whether the death penalty is to be sustained in any given case, the court shall determine:

"(1) Whether the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor, and

"(2) Whether, in cases other than treason or aircraft hijacking, the evidence supports the jury's or judge's finding of a statutory aggravating circumstance as enumerated in section 27–2534.1 (b), and

"(3) Whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant. . . ."

In order that information regarding "similar cases" may be before the court, the post of Assistant to the Supreme Court was created. The Assistant must "accumulate the records of all capital felony cases in which sentence was imposed after January 1, 1970, or such earlier date as the court may deem appropriate." § 27–2537 (f).[3] The court is required to include in its decision a reference to "those similar cases which it took into consideration." § 27–2537 (e).

## II

Petitioner Troy Gregg and a 16-year-old companion, Floyd Allen, were hitchhiking from Florida to Asheville, N. C., on November 21, 1973. They were picked up in an automobile driven by Fred Simmons and Bob Moore, both of whom were drunk. The car broke down and Simmons purchased a new one—a 1960 Pontiac—using

---

[3] Section 27–2537 (g) provides:

"The court shall be authorized to employ an appropriate staff and such methods to compile such data as are deemed by the Chief Justice to be appropriate and relevant to the statutory questions concerning the validity of the sentence. . . ."

part of a large roll of cash which he had with him. After picking up another hitchhiker in Florida and dropping him off in Atlanta, the car proceeded north to Gwinnett County, Ga., where it stopped so that Moore and Simmons could urinate. While they were out of the car Simmons was shot in the eye and Moore was shot in the right cheek and in the back of the head. Both died as a result.

On November 24, 1973, at 3 p. m., on the basis of information supplied by the hitchhiker, petitioner and Allen were arrested in Asheville, N. C. They were then in possession of the car which Simmons had purchased; petitioner was in possession of the gun which had killed Simmons and Moore and $107 which had been taken from them; and in the motel room in which petitioner was staying was a new stereo and a car stereo player.

At about 11 p. m., after the Gwinnett County police had arrived, petitioner made a statement to them admitting that he had killed Moore and Simmons, but asserting that he had killed them in self-defense and in defense of Allen. He also admitted robbing them of $400 and taking their car. A few moments later petitioner was asked why he had shot Moore and Simmons and responded: "By God, I wanted them dead."

At about 1 o'clock the next morning, petitioner and Allen were released to the custody of the Gwinnett County police and were transported in two cars back to Gwinnett County. On the way, at about 5 a. m., the car stopped at the place where Moore and Simmons had been killed. Everyone got out of the car. Allen was asked, in petitioner's presence, how the killing occurred. He said that he had been sitting in the back seat of the 1960 Pontiac and was about half asleep. He woke up when the car stopped. Simmons and Moore got out, and as soon as they did petitioner turned around and told Allen: "Get out, we're going to rob them." Allen said that he

got out and walked toward the back of the car, looked around and could see petitioner, with a gun in his hand, leaning up against the car so he could get a good aim. Simmons and Moore had gone down the bank and had relieved themselves and as they were coming up the bank petitioner fired three shots. One of the men fell, the other staggered. Petitioner then circled around the back and approached the two men, both of whom were now lying in the ditch, from behind. He placed the gun to the head of one of them and pulled the trigger. Then he went quickly to the other one and placed the gun to his head and pulled the trigger again. He then took the money, whatever was in their pockets. He told Allen to get in the car and they drove away.

When Allen had finished telling this story, one of the officers asked petitioner if this was the way it had happened. Petitioner hung his head and said that it was. The officer then said: "You mean you shot these men down in cold blooded murder just to rob them," and petitioner said yes. The officer then asked him why and petitioner said he did not know. Petitioner was indicted in two counts for murder and in two counts for robbery.

At trial, petitioner's defense was that he had killed in self-defense. He testified in his own behalf and told a version of the events similar to that which he had originally told to the Gwinnett County police. On cross-examination, he was confronted with a letter to Allen recounting a version of the events similar to that to which he had just testified and instructing Allen to memorize and burn the letter. Petitioner conceded writing the version of the events, but denied writing the portion of the letter which instructed Allen to memorize and burn it. In rebuttal, the State called a handwriting expert who testified that the entire letter was written by the same person.

The jury was instructed on the elements of murder [4] and robbery. The trial judge gave an instruction on self-defense, but refused to submit the lesser included

---

[4] The court said:

"And, I charge you that our law provides, in connection with the offense of murder the following. A person commits murder when he unlawfully and with malice aforethought, either express or implied causes the death of another human being.

"Express malice is that deliberate intention, unlawfully to take away the life of a fellow creature which is manifested by external circumstances, capable of proof.

"Malice shall be implied where no considerable provocation appears and where all of the circumstances of the killing show an abandoned and malignant heart.

"Section B of this Code Section, our law provides that a person also commits the crime of murder when in the commission of a felony he causes the death of another human being irrespective of malice.

"Now, then, I charge you that if you find and believe beyond a reasonable doubt that the defendant did commit the homicide in the two counts alleged in this indictment, at the time he was engaged in the commission of some other felony, you would be authorized to find him guilty of murder.

"In this connection, I charge you that in order for a homicide to have been done in the perpetration of a felony, there must be some connection between the felony and the homicide. The homicide must have been done in pursuance of the unlawful act not collateral to it. It is not enough that the homicide occurred soon or presently after the felony was attempted or committed, there must be such a legal relationship between the homicide and the felony that you find that the homicide occurred by reason of and a part of the felony or that it occurred before the felony was at an end, so that the felony had a legal relationship to the homicide and was concurrent with it in part at least, and a part of it in an actual and material sense. A homicide is committed in the perpetration of a felony when it is committed by the accused while he is engaged in the performance of any act required for the full execution of such felony.

"I charge you that if you find and believe beyond a reasonable doubt that the homicide alleged in this indictment was caused by

offense of manslaughter to the jury. It returned verdicts of guilty on all counts.

No new evidence was presented at the sentencing proceeding. However, the prosecutor and the attorney for petitioner each made arguments to the jury on the issue of punishment. The prosecutor emphasized the strength of the case against petitioner and the fact that he had murdered in order to eliminate the witnesses to the robbery. The defense attorney emphasized the possibility that a mistake had been made and that petitioner was not guilty. The trial judge instructed the jury on

---

the defendant while he, the said accused was in the commission of a felony as I have just given you in this charge, you would be authorized to convict the defendant of murder.

"And this you would be authorized to do whether the defendant intended to kill the deceased or not. A homicide, although unintended, if committed by the accused at the time he is engaged in the commission of some other felony constitutes murder.

"In order for a killing to have been done in perpetration or attempted perpetration of a felony, or of a particular felony, there must be some connection as I previously charged you between the felony and the homicide.

"Before you would be authorized to find the defendant guilty of the offense of murder, you must find and believe beyond a reasonable doubt, that the defendant did, with malice aforethought either express or implied cause the deaths of [Simmons or Moore] or you must find and believe beyond a reasonable doubt that the defendant, while in the commission of a felony caused the death of these two victims just named.

"I charge you, that if you find and believe that, at any time prior to the date this indictment was returned into this court that the defendant did, in the county of Gwinnett, State of Georgia, with malice aforethought kill and murder the two men just named in the way and manner set forth in the indictment or that the defendant caused the deaths of these two men in the way and manner set forth in the indictment, while he, the said accused was in the commission of a felony, then in either event, you would be authorized to find the defendant guilty of murder."

their sentencing function and in so doing submitted to them three statutory aggravating circumstances. He stated:

"Now, as to counts one and three, wherein the defendant is charged with the murders of—has been found guilty of the murders of [Simmons and Moore], the following aggravating circumstances are some that you can consider, as I say, you must find that these existed beyond a reasonable doubt before the death penalty can be imposed.

"One—That the offense of murder was committed while the offender was engaged in the commission of two other capital felonies, to-wit the armed robbery of [Simmons and Moore].

"Two—That the offender committed the offense of murder for the purpose of receiving money and the automobile described in the indictment.

"Three—The offense of murder was outrageously and wantonly vile, horrible and inhuman, in that they involved the depravity of mind of the defendant.

"Now, so far as the counts two and four, that is the counts of armed robbery, of which you have found the defendant guilty, then you may find—inquire into these aggravating circumstances.

"That the offense of armed robbery was committed while the offender was engaged in the commission of two capital felonies, to-wit the murders of [Simmons and Moore] or that the offender committed the offense of armed robbery for the purpose of receiving money and the automobile set forth in the indictment, or three, that the offense of armed robbery was outrageously and wantonly vile, horrible and inhuman in that they involved the depravity of the mind of the defendant.

"Now, if you find that there was one or more of these aggravating circumstances existed beyond a reasonable doubt, then and I refer to each individual count, then you would be authorized to consider imposing the sentence of death.

"If you do not find that one of these aggravating circumstances existed beyond a reasonable doubt, in either of these counts, then you would not be authorized to consider the penalty of death. In that event, the sentence as to counts one and three, those are the counts wherein the defendant was found guilty of murder, the sentence could be imprisonment for life." Tr. 476–477.

The jury returned the death penalty on all four counts finding all the aggravating circumstances submitted to it, except that it did not find the crimes to have been "outrageously or wantonly vile," etc.

On appeal the Georgia Supreme Court affirmed the death sentences on the murder counts and vacated the death sentences on the robbery counts. 233 Ga. 117, 210 S. E. 2d 659 (1974). It concluded that the murder sentences were not imposed under the influence of passion, prejudice, or any other arbitrary factor; that the evidence supported the finding of a statutory aggravating factor with respect to the murders; and, citing several cases in which the death penalty had been imposed previously for murders of persons who had witnessed a robbery, held:

"After considering both the crimes and the defendant and after comparing the evidence and the sentences in this case with those of previous murder cases, we are also of the opinion that these two sentences of death are not excessive or disproportionate to the penalties imposed in similar cases

which are hereto attached." [5]  *Id.,* at 127, 210 S. E. 2d, at 667.

However, it held with respect to the robbery sentences:

"Although there is no indication that these two

---

[5] In a subsequently decided robbery-murder case, the Georgia Supreme Court had the following to say about the same "similar cases" referred to in this case:

"We have compared the evidence and sentence in this case with other similar cases and conclude the sentence of death is not excessive or disproportionate to the penalty imposed in those cases. Those similar cases we considered in reviewing the case are: *Lingo v. State,* 226 Ga. 496 (175 SE2d 657), *Johnson v. State,* 226 Ga. 511 (175 SE2d 840), *Pass v. State,* 227 Ga. 730 (182 SE2d 779), *Watson v. State,* 229 Ga. 787 (194 SE2d 407), *Scott v. State,* 230 Ga. 413 (197 SE2d 338), *Kramer v. State,* 230 Ga. 855 (199 SE2d 805), and *Gregg v. State,* 233 Ga. 117 (210 SE2d 659).

"In each of the comparison cases cited, the records show that the accused was found guilty of murder of the victim of the robbery or burglary committed in the course of such robbery or burglary. In each of those cases, the jury imposed the sentence of death. In *Pass v. State,* supra, the murder took place in the victim's home, as occurred in the case under consideration.

"We find that the sentence of death in this case is not excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant. Code Ann. § 27–2537 (c) (3). Notwithstanding the fact that there have been cases in which robbery victims were murdered and the juries imposed life sentences (see Appendix), the cited cases show that juries faced with similar factual situations have imposed death sentences. Compare *Coley v. State,* 231 Ga. 829, 835, supra. Thus the sentence here was not 'wantonly and freakishly imposed' (see above)." *Moore* v. *State,* 233 Ga. 861, 865–866, 213 S. E. 2d 829, 833 (1975).

In another case decided after the instant case the Georgia Supreme Court stated:

"The cases reviewed included all murder cases coming to this court since January 1, 1970. All kidnapping cases were likewise reviewed. The comparison involved a search for similarities in addition to the similarity of offense charged and sentence imposed.

"All of the murder cases selected for comparison involved mur-

sentences were imposed under the influence of passion, prejudice or any other arbitrary factor, the sentences imposed here are unusual in that they are rarely imposed for this offense. Thus, under the test provided by statute for comparison (Code Ann. § 27–2537 (c), (3)), they must be considered to be excessive or disproportionate to the penalties imposed in similar cases." *Ibid.*

Accordingly, the sentences on the robbery counts were vacated.

## III

The threshold question in this case is whether the death penalty may be carried out for murder under the Georgia legislative scheme consistent with the decision in *Furman* v. *Georgia, supra.* In *Furman,* this Court held that as a result of giving the sentencer unguided discretion to impose or not to impose the death penalty for murder, the penalty was being imposed discrimina-

---

ders wherein all of the witnesses were killed or an attempt was made to kill all of the witnesses, and kidnapping cases where the victim was killed or seriously injured.

"The cases indicate that, except in some special circumstance such as a juvenile or an accomplice driver of a get-away vehicle, where the murder was committed and trial held at a time when the death penalty statute was effective, juries generally throughout the state have imposed the death penalty. The death penalty has also been imposed when the kidnap victim has been mistreated or seriously injured. In this case the victim was murdered.

"The cold blooded and callous nature of the offenses in this case are the types condemned by death in other cases. This defendant's death sentences for murder and kidnapping are not excessive or disproportionate to the penalty imposed in similar cases. Using the standards prescribed for our review by the statute, we conclude that the sentences of death imposed in this case for murder and kidnapping were not imposed under the influence of passion, prejudice or any other arbitrary factor." *Jarrell* v. *State,* 234 Ga. 410, 425–426, 216 S. E. 2d 258, 270 (1975).

torily,[6] wantonly and freakishly,[7] and so infrequently [8] that any given death sentence was cruel and unusual. Petitioner argues that, as in *Furman,* the jury is still the sentencer; that the statutory criteria to be considered by the jury on the issue of sentence under Georgia's new statutory scheme are vague and do not purport to be all-inclusive; and that, in any event, there are *no* circumstances under which the jury is required to impose the death penalty.[9]  Consequently, the petitioner argues that the death penalty will inexorably be imposed in as discriminatory, standardless, and rare a manner as it was imposed under the scheme declared invalid in *Furman.*

The argument is considerably overstated.  The Georgia Legislature has made an effort to identify those aggravating factors which it considers necessary and relevant to the question whether a defendant convicted of capital murder should be sentenced to death.[10]  The

---

[6] See *Furman* v. *Georgia,* 408 U. S., at 240 (Douglas, J., concurring).

[7] See *id.,* at 306 (STEWART, J., concurring).

[8] See *id.,* at 310 (WHITE, J., concurring).

[9] Petitioner also argues that the differences between murder—for which the death penalty may be imposed—and manslaughter—for which it may not be imposed—are so difficult to define and the jury's ability to disobey the trial judge's instructions so unfettered that juries will use the guilt-determination phase of a trial arbitrarily to convict some of a capital offense while convicting similarly situated individuals only of noncapital offenses.  I believe this argument is enormously overstated.  However, since the jury has discretion not to impose the death penalty at the sentencing phase of a case in Georgia, the problem of offense definition and jury nullification loses virtually all its significance in this case.

[10] The factor relevant to this case is that the "murder . . . was committed while the offender was engaged in the commission of another capital felony."  The State in its brief refers to this type of murder as "witness-elimination" murder.  Apparently the State of Georgia wishes to supply a substantial incentive to those engaged

jury which imposes sentence is instructed on all statutory aggravating factors which are supported by the evidence, and is told that it may not impose the death penalty unless it unanimously finds at least one of those factors to have been established beyond a reasonable doubt. The Georgia Legislature has plainly made an effort to guide the jury in the exercise of its discretion, while at the same time permitting the jury to dispense mercy on the basis of factors too intangible to write into a statute, and I cannot accept the naked assertion that the effort is bound to fail. As the types of murders for which the death penalty may be imposed become more narrowly defined and are limited to those which are particularly serious or for which the death penalty is peculiarly appropriate as they are in Georgia by reason of the aggravating-circumstance requirement, it becomes reasonable to expect that juries—even given discretion *not* to impose the death penalty—will impose the death penalty in a substantial portion of the cases so defined. If they do, it can no longer be said that the penalty is being imposed wantonly and freakishly or so infrequently that it loses its usefulness as a sentencing device. There is, therefore, reason to expect that Georgia's current system would escape the infirmities which invalidated its previous system under *Furman*. However, the Georgia Legislature was not satisfied with a system which might, but also might not, turn out in practice to result in death sentences being imposed with reasonable consistency for certain serious murders. Instead, it gave the Georgia Supreme Court the power and the obligation to perform precisely the task which three Justices of this Court, whose opinions were necessary to the result, performed

---

in robbery to leave their guns at home and to persuade their co-conspirators to do the same in the hope that fewer victims of robberies will be killed.

.in *Furman:* namely, the task of deciding whether *in fact* the death penalty was being administered for any given class of crime in a discriminatory, standardless, or rare fashion.

In considering any given death sentence on appeal, the Georgia Supreme Court is to determine whether the sentence imposed was consistent with the relevant statutes—*i. e.,* whether there was sufficient evidence to support the finding of an aggravating circumstance. Ga. Code Ann. § 27–2537 (c)(2) (Supp. 1975). However, it must do much more than determine whether the penalty was lawfully imposed. It must go on to decide—after reviewing the penalties imposed in "similar cases"— whether the penalty is "excessive or disproportionate" considering both the crime and the defendant. § 27–2537 (c)(3) (Supp. 1975). The new Assistant to the Supreme Court is to assist the court in collecting the records of "all capital felony cases" [11] in the State of Georgia in which sentence was imposed after January 1, 1970. § 27–2537 (f) (Supp. 1975). The court also has the obligation of determining whether the penalty was "imposed under the influence of passion, prejudice, or any other arbitrary factor." § 27–2537 (c)(1) (Supp. 1975). The Georgia Supreme Court has interpreted the appellate review statute to require it to set aside the death sentence whenever juries across the State impose it only rarely for the type of crime in question; but to require it to affirm death sentences whenever juries across the State generally impose it for the crime in question.

[11] Petitioner states several times without citation that the only cases considered by the Georgia Supreme Court are those in which an appeal was taken either from a sentence of death or life imprisonment. This view finds no support in the language of the relevant statutes. *Moore* v. *State,* 233 Ga., at 863–864, 213 S. E. 2d, at 832.

Thus, in this case the Georgia Supreme Court concluded that the death penalty was so rarely imposed for the crime of robbery that it set aside the sentences on the robbery counts, and effectively foreclosed that penalty from being imposed for that crime in the future under the legislative scheme now in existence. Similarly, the Georgia Supreme Court has determined that juries impose the death sentence too rarely with respect to certain classes of rape. Compare *Coley* v. *State,* 231 Ga. 829, 204 S. E. 2d 612 (1974), with *Coker* v. *State,* 234 Ga. 555, 216 S. E. 2d 782 (1975). However, it concluded that juries "generally throughout the state" have imposed the death penalty for those who murder witnesses to armed robberies. *Jarrell* v. *State,* 234 Ga. 410, 425, 216 S. E. 2d 258, 270 (1975). Consequently, it affirmed the sentences in this case on the murder counts. If the Georgia Supreme Court is correct with respect to this factual judgment, imposition of the death penalty in this and similar cases is consistent with *Furman.* Indeed, if the Georgia Supreme Court properly performs the task assigned to it under the Georgia statutes, death sentences imposed for discriminatory reasons or wantonly or freakishly for any given category of crime will be set aside. Petitioner has wholly failed to establish, and has not even attempted to establish, that the Georgia Supreme Court failed properly to perform its task in this case or that it is incapable of performing its task adequately in all cases; and this Court should not assume that it did not do so.

Petitioner also argues that decisions made by the prosecutor—either in negotiating a plea to some lesser offense than capital murder or in simply declining to charge capital murder—are standardless and will inexorably result in the wanton and freakish imposition of the penalty condemned by the judgment in *Furman.* I address this

point separately because the cases in which no capital offense is charged escape the view of the Georgia Supreme Court and are not considered by it in determining whether a particular sentence is excessive or disproportionate.

Petitioner's argument that prosecutors behave in a standardless fashion in deciding which cases to try as capital felonies is unsupported by any facts. Petitioner simply asserts that since prosecutors have the power not to charge capital felonies they will exercise that power in a standardless fashion. This is untenable. Absent facts to the contrary, it cannot be assumed that prosecutors will be motivated in their charging decision by factors other than the strength of their case and the likelihood that a jury would impose the death penalty if it convicts. Unless prosecutors are incompetent in their judgments, the standards by which they decide whether to charge a capital felony will be the same as those by which the jury will decide the questions of guilt and sentence. Thus defendants will escape the death penalty through prosecutorial charging decisions only because the offense is not sufficiently serious; or because the proof is insufficiently strong. This does not cause the system to be standardless any more than the jury's decision to impose life imprisonment on a defendant whose crime is deemed insufficiently serious or its decision to acquit someone who is probably guilty but whose guilt is not established beyond a reasonable doubt. Thus the prosecutor's charging decisions are unlikely to have removed from the sample of cases considered by the Georgia Supreme Court any which are truly "similar." If the cases really were "similar" in relevant respects, it is unlikely that prosecutors would fail to prosecute them as capital cases; and I am unwilling to assume the contrary.

Petitioner's argument that there is an unconstitutional

amount of discretion in the system which separates those suspects who receive the death penalty from those who receive life imprisonment, a lesser penalty, or are acquitted or never charged, seems to be in final analysis an indictment of our entire system of justice. Petitioner has argued, in effect, that no matter how effective the death penalty may be as a punishment, government, created and run as it must be by humans, is inevitably incompetent to administer it. This cannot be accepted as a proposition of constitutional law. Imposition of the death penalty is surely an awesome responsibility for any system of justice and those who participate in it. Mistakes will be made and discriminations will occur which will be difficult to explain. However, one of society's most basic tasks is that of protecting the lives of its citizens and one of the most basic ways in which it achieves the task is through criminal laws against murder. I decline to interfere with the manner in which Georgia has chosen to enforce such laws on what is simply an assertion of lack of faith in the ability of the system of justice to operate in a fundamentally fair manner.

## IV

For the reasons stated in dissent in *Roberts* v. *Louisiana, post*, at 350–356, neither can I agree with the petitioner's other basic argument that the death penalty, however imposed and for whatever crime, is cruel and unusual punishment.

I therefore concur in the judgment of affirmance.

Statement of THE CHIEF JUSTICE and MR. JUSTICE REHNQUIST:

We concur in the judgment and join the opinion of MR. JUSTICE WHITE, agreeing with its analysis that Georgia's system of capital punishment comports with

the Court's holding in *Furman* v. *Georgia,* 408 U. S. 238 (1972).

Mr. Justice Blackmun, concurring in the judgment.

I concur in the judgment. See *Furman* v. *Georgia,* 408 U. S. 238, 405–414 (1972) (Blackmun, J., dissenting), and *id.,* at 375 (Burger, C. J., dissenting); *id.,* at 414 Powell, J., dissenting); *id.,* at 465 (Rehnquist, J., dissenting).

Mr. Justice Brennan, dissenting.*

The Cruel and Unusual Punishments Clause "must draw its meaning from the evolving standards of decency that mark the progress of a maturing society." [1] The opinions of Mr. Justice Stewart, Mr. Justice Powell, and Mr. Justice Stevens today hold that "evolving standards of decency" require focus not on the essence of the death penalty itself but primarily upon the procedures employed by the State to single out persons to suffer the penalty of death. Those opinions hold further that, so viewed, the Clause invalidates the mandatory infliction of the death penalty but not its infliction under sentencing procedures that Mr. Justice Stewart, Mr. Justice Powell, and Mr. Justice Stevens conclude adequately safeguard against the risk that the death penalty was imposed in an arbitrary and capricious manner.

In *Furman* v. *Georgia,* 408 U. S. 238, 257 (1972) (concurring opinion), I read "evolving standards of decency" as requiring focus upon the essence of the death penalty itself and not primarily or solely upon the procedures

---

*[This opinion applies also to No. 75–5706, *Proffitt* v. *Florida, post,* p. 242, and No. 75–5394, *Jurek* v. *Texas, post,* p. 262.]

[1] *Trop* v. *Dulles,* 356 U. S. 86, 101 (1958) (plurality opinion of Warren, C. J.).

under which the determination to inflict the penalty upon a particular person was made. I there said:

"From the beginning of our Nation, the punishment of death has stirred acute public controversy. Although pragmatic arguments for and against the punishment have been frequently advanced, this longstanding and heated controversy cannot be explained solely as the result of differences over the practical wisdom of a particular government policy. At bottom, the battle has been waged on moral grounds. The country has debated whether a society for which the dignity of the individual is the supreme value can, without a fundamental inconsistency, follow the practice of deliberately putting some of its members to death. In the United States, as in other nations of the western world, 'the struggle about this punishment has been one between ancient and deeply rooted beliefs in retribution, atonement or vengeance on the one hand, and, on the other, beliefs in the personal value and dignity of the common man that were born of the democratic movement of the eighteenth century, as well as beliefs in the scientific approach to an understanding of the motive forces of human conduct, which are the result of the growth of the sciences of behavior during the nineteenth and twentieth centuries.' It is this essentially moral conflict that forms the backdrop for the past changes in and the present operation of our system of imposing death as a punishment for crime." *Id.,* at 296.[2]

That continues to be my view. For the Clause forbidding cruel and unusual punishments under our con-

---

[2] Quoting T. Sellin, The Death Penalty, A Report for the Model Penal Code Project of the American Law Institute 15 (1959).

stitutional system of government embodies in unique degree moral principles restraining the punishments that our civilized society may impose on those persons who transgress its laws. Thus, I too say: "For myself, I do not hesitate to assert the proposition that the only way the law has progressed from the days of the rack, the screw and the wheel is the development of moral concepts, or, as stated by the Supreme Court . . . the application of 'evolving standards of decency' . . . ." [3]

This Court inescapably has the duty, as the ultimate arbiter of the meaning of our Constitution, to say whether, when individuals condemned to death stand before our Bar, "moral concepts" require us to hold that the law has progressed to the point where we should declare that the punishment of death, like punishments on the rack, the screw, and the wheel, is no longer morally tolerable in our civilized society.[4] My opinion in *Furman* v. *Georgia* concluded that our civilization and the law had progressed to this point and that therefore the punishment of death, for whatever crime and under all circumstances, is "cruel and unusual" in violation of the Eighth and Fourteenth Amendments of the Constitution. I shall not again canvass the reasons that led to that conclusion. I emphasize only that foremost among the "moral concepts" recognized in our cases and inherent in the Clause is the primary moral principle that the State, even as it punishes, must treat its citizens in a manner consistent with their intrinsic worth as human beings—a punishment must not be so severe as to be degrading to human dignity. A judicial determina-

---

[3] *Novak* v. *Beto*, 453 F. 2d 661, 672 (CA5 1971) (Tuttle, J., concurring in part and dissenting in part).

[4] Tao, Beyond *Furman* v. *Georgia:* The Need for a Morally Based Decision on Capital Punishment, 51 Notre Dame Law. 722, 736 (1976).

tion whether the punishment of death comports with human dignity is therefore not only permitted but compelled by the Clause. 408 U. S., at 270.

I do not understand that the Court disagrees that "[i]n comparison to all other punishments today . . . the deliberate extinguishment of human life by the State is uniquely degrading to human dignity." *Id.*, at 291. For three of my Brethren hold today that mandatory infliction of the death penalty constitutes the penalty cruel and unusual punishment. I perceive no principled basis for this limitation. Death for whatever crime and under all circumstances "is truly an awesome punishment. The calculated killing of a human being by the State involves, by its very nature, a denial of the executed person's humanity. . . . An executed person has indeed 'lost the right to have rights.'" *Id.*, at 290. Death is not only an unusually severe punishment, unusual in its pain, in its finality, and in its enormity, but it serves no penal purpose more effectively than a less severe punishment; therefore the principle inherent in the Clause that prohibits pointless infliction of excessive punishment when less severe punishment can adequately achieve the same purposes invalidates the punishment. *Id.*, at 279.

The fatal constitutional infirmity in the punishment of death is that it treats "members of the human race as nonhumans, as objects to be toyed with and discarded. [It is] thus inconsistent with the fundamental premise of the Clause that even the vilest criminal remains a human being possessed of common human dignity." *Id.*, at 273. As such it is a penalty that "subjects the individual to a fate forbidden by the principle of civilized treatment guaranteed by the [Clause]." [5] I therefore would hold,

---

[5] *Trop* v. *Dulles*, 356 U. S., at 99 (plurality opinion of Warren, C. J.).

on that ground alone, that death is today a cruel and unusual punishment prohibited by the Clause. "Justice of this kind is obviously no less shocking than the crime itself, and the new 'official' murder, far from offering redress for the offense committed against society, adds instead a second defilement to the first." [6]

I dissent from the judgments in No. 74–6257, *Gregg* v. *Georgia,* No. 75–5706, *Proffitt* v. *Florida,* and No. 75–5394, *Jurek* v. *Texas,* insofar as each upholds the death sentences challenged in those cases. I would set aside the death sentences imposed in those cases as violative of the Eighth and Fourteenth Amendments.

MR. JUSTICE MARSHALL, dissenting.[*]

In *Furman* v. *Georgia,* 408 U. S. 238, 314 (1972) (concurring opinion), I set forth at some length my views on the basic issue presented to the Court in these cases. The death penalty, I concluded, is a cruel and unusual punishment prohibited by the Eighth and Fourteenth Amendments. That continues to be my view.

I have no intention of retracing the "long and tedious journey," *id.,* at 370, that led to my conclusion in *Furman.* My sole purposes here are to consider the suggestion that my conclusion in *Furman* has been undercut by developments since then, and briefly to evaluate the basis for my Brethren's holding that the extinction of life is a permissible form of punishment under the Cruel and Unusual Punishments Clause.

In *Furman* I concluded that the death penalty is constitutionally invalid for two reasons. First, the death penalty is excessive. *Id.,* at 331–332; 342–359. And

---

[6] A. Camus, Reflections on the Guillotine 5–6 (Fridtjof-Karla Pub. 1960).

[*][This opinion applies also to No. 75–5706, *Proffitt* v. *Florida, post,* p. 242, and No. 75–5394, *Jurek* v. *Texas, post,* p. 262.]

second, the American people, fully informed as to the purposes of the death penalty and its liabilities, would in my view reject it as morally unacceptable. *Id.*, at 360–369.

Since the decision in *Furman*, the legislatures of 35 States have enacted new statutes authorizing the imposition of the death sentence for certain crimes, and Congress has enacted a law providing the death penalty for air piracy resulting in death. 49 U. S. C. §§ 1472 (i), (n) (1970 ed., Supp. IV). I would be less than candid if I did not acknowledge that these developments have a significant bearing on a realistic assessment of the moral acceptability of the death penalty to the American people. But if the constitutionality of the death penalty turns, as I have urged, on the opinion of an *informed* citizenry, then even the enactment of new death statutes cannot be viewed as conclusive. In *Furman*, I observed that the American people are largely unaware of the information critical to a judgment on the morality of the death penalty, and concluded that if they were better informed they would consider it shocking, unjust, and unacceptable. 408 U. S., at 360–369. A recent study, conducted after the enactment of the post-*Furman* statutes, has confirmed that the American people know little about the death penalty, and that the opinions of an informed public would differ significantly from those of a public unaware of the consequences and effects of the death penalty.[1]

Even assuming, however, that the post-*Furman* enactment of statutes authorizing the death penalty renders the prediction of the views of an informed citizenry an

---

[1] Sarat & Vidmar, Public Opinion, The Death Penalty, and the Eighth Amendment: Testing the Marshall Hypothesis, 1976 Wis. L. Rev. 171.

uncertain basis for a constitutional decision, the enactment of those statutes has no bearing whatsoever on the conclusion that the death penalty is unconstitutional because it is excessive. An excessive penalty is invalid under the Cruel and Unusual Punishments Clause "even though popular sentiment may favor" it. *Id.*, at 331; *ante,* at 173, 182–183 (opinion of STEWART, POWELL, and STEVENS, JJ.); *Roberts* v. *Louisiana, post,* at 353–354 (WHITE, J., dissenting). The inquiry here, then, is simply whether the death penalty is necessary to accomplish the legitimate legislative purposes in punishment, or whether a less severe penalty—life imprisonment—would do as well. *Furman, supra,* at 342 (MARSHALL, J., concurring).

The two purposes that sustain the death penalty as nonexcessive in the Court's view are general deterrence and retribution. In *Furman,* I canvassed the relevant data on the deterrent effect of capital punishment. 408 U. S., at 347–354.[2] The state of knowledge at that point, after literally centuries of debate, was summarized as follows by a United Nations Committee:

> "It is generally agreed between the retentionists and abolitionists, whatever their opinions about the validity of comparative studies of deterrence, that the data which now exist show no correlation between the existence of capital punishment and lower rates of capital crime."[3]

The available evidence, I concluded in *Furman,* was convincing that "capital punishment is not necessary as a deterrent to crime in our society." *Id.*, at 353.

The Solicitor General in his *amicus* brief in these cases

[2] See *e. g.,* T. Sellin, The Death Penalty, A Report for the Model Penal Code Project of the American Law Institute (1959).

[3] United Nations, Department of Economic and Social Affairs, Capital Punishment, pt. II, ¶ 159, p. 123 (1968).

relies heavily on a study by Isaac Ehrlich,[4] reported a year after *Furman,* to support the contention that the death penalty does deter murder. Since the Ehrlich study was not available at the time of *Furman* and since it is the first scientific study to suggest that the death penalty may have a deterrent effect, I will briefly consider its import.

The Ehrlich study focused on the relationship in the Nation as a whole between the homicide rate and "execution risk"—the fraction of persons convicted of murder who were actually executed. Comparing the differences in homicide rate and execution risk for the years 1933 to 1969, Ehrlich found that increases in execution risk were associated with increases in the homicide rate.[5] But when he employed the statistical technique of multiple regression analysis to control for the influence of other variables posited to have an impact on the homicide rate,[6] Ehrlich found a negative correlation between changes in the homicide rate and changes in execution risk. His tentative conclusion was that for the period from 1933 to 1967 each additional execution in the United States might have saved eight lives.[7]

The methods and conclusions of the Ehrlich study

---

[4] I. Ehrlich, The Deterrent Effect of Capital Punishment: A Question of Life and Death (Working Paper No. 18, National Bureau of Economic Research, Nov. 1973); Ehrlich, The Deterrent Effect of Capital Punishment: A Question of Life and Death, 65 Am. Econ. Rev. 397 (June 1975).

[5] *Id.,* at 409.

[6] The variables other than execution risk included probability of arrest, probability of conviction given arrest, national aggregate measures of the percentage of the population between age 14 and 24, the unemployment rate, the labor force participation rate, and estimated per capita income.

[7] *Id.,* at 398, 414.

have been severely criticized on a number of grounds.[8] It has been suggested, for example, that the study is defective because it compares execution and homicide rates on a nationwide, rather than a state-by-state, basis. The aggregation of data from all States—including those that have abolished the death penalty—obscures the relationship between murder and execution rates. Under Ehrlich's methodology, a decrease in the execution risk in one State combined with an increase in the murder rate in another State would, all other things being equal, suggest a deterrent effect that quite obviously would not exist. Indeed, a deterrent effect would be suggested if, once again all other things being equal, one State abolished the death penalty and experienced no change in the murder rate, while another State experienced an increase in the murder rate.[9]

The most compelling criticism of the Ehrlich study is

---

[8] See Passell & Taylor, The Deterrent Effect of Capital Punishment: Another View (unpublished Columbia University Discussion Paper 74–7509, Mar. 1975), reproduced in Brief for Petitioner App. E in *Jurek* v. *Texas*, O. T. 1975, No. 75–5844; Passell, The Deterrent Effect of the Death Penalty: A Statistical Test, 28 Stan. L. Rev. 61 (1975); Baldus & Cole, A Comparison of the Work of Thorsten Sellin & Isaac Ehrlich on the Deterrent Effect of Capital Punishment, 85 Yale L. J. 170 (1975); Bowers & Pierce, The Illusion of Deterrence in Isaac Ehrlich's Research on Capital Punishment, 85 Yale L. J. 187 (1975); Peck, The Deterrent Effect of Capital Punishment: Ehrlich and His Critics, 85 Yale L. J. 359 (1976). See also Ehrlich, Deterrence: Evidence and Inference, 85 Yale L. J. 209 (1975); Ehrlich, Rejoinder, 85 Yale L. J. 368 (1976). In addition to the items discussed in text, criticism has been directed at the quality of Ehrlich's data, his choice of explanatory variables, his failure to account for the interdependence of those variables, and his assumptions as to the mathematical form of the relationship between the homicide rate and the explanatory variables.

[9] See Baldus & Cole, *supra*, at 175–177.

that its conclusions are extremely sensitive to the choice of the time period included in the regression analysis. Analysis of Ehrlich's data reveals that all empirical support for the deterrent effect of capital punishment disappears when the five most recent years are removed from his time series—that is to say, whether a decrease in the execution risk corresponds to an increase or a decrease in the murder rate depends on the ending point of the sample period.[10] This finding has cast severe doubts on the reliability of Ehrlich's tentative conclusions.[11] Indeed, a recent regression study, based on Ehrlich's theoretical model but using cross-section state data for the years 1950 and 1960, found no support for the conclusion that executions act as a deterrent.[12]

The Ehrlich study, in short, is of little, if any, assistance in assessing the deterrent impact of the death penalty. Accord, *Commonwealth* v. *O'Neal,* —— Mass. ——, ——, 339 N. E. 2d 676, 684 (1975). The evidence I reviewed in *Furman* [13] remains convincing, in my view, that "capital punishment is not necessary as a deterrent to crime in our society." 408 U. S., at 353. The justification for the death penalty must be found elsewhere.

The other principal purpose said to be served by the death penalty is retribution.[14] The notion that retribu-

---

[10] Bowers & Pierce, *supra,* n. 8, at 197–198. See also Passell & Taylor, *supra,* n. 8, at 2–66—2–68.

[11] See Bowers & Pierce, *supra,* n. 8, at 197–198; Baldus & Cole, *supra,* n. 8, at 181, 183–185; Peck, *supra,* n. 8, at 366–367.

[12] Passell, *supra,* n. 8.

[13] See also Bailey, Murder and Capital Punishment: Some Further Evidence, 45 Am. J. Orthopsychiatry 669 (1975); W. Bowers, Executions in America 121–163 (1974).

[14] In *Furman,* I considered several additional purposes arguably served by the death penalty. 408 U. S., at 314, 342, 355–358. The only additional purpose mentioned in the opinions in these cases is specific deterrence—preventing the murderer from com-

tion can serve as a moral justification for the sanction of death finds credence in the opinion of my Brothers Stewart, Powell, and Stevens, and that of my Brother White in *Roberts* v. *Louisiana, post,* p. 337. See also *Furman* v. *Georgia,* 408 U. S., at 394–395 (Burger, C. J., dissenting). It is this notion that I find to be the most disturbing aspect of today's unfortunate decisions.

The concept of retribution is a multifaceted one, and any discussion of its role in the criminal law must be undertaken with caution. On one level, it can be said that the notion of retribution or reprobation is the basis of our insistence that only those who have broken the law be punished, and in this sense the notion is quite obviously central to a just system of criminal sanctions. But our recognition that retribution plays a crucial role in determining who may be punished by no means requires approval of retribution as a general justification for punishment.[15] It is the question whether retribution can provide a moral justification for punishment—in particular, capital punishment—that we must consider.

My Brothers Stewart, Powell, and Stevens offer the following explanation of the retributive justification for capital punishment:

> " 'The instinct for retribution is part of the nature of man, and channeling that instinct in the administration of criminal justice serves an important purpose in promoting the stability of a society governed

---

mitting another crime. Surely life imprisonment and, if necessary, solitary confinement would fully accomplish this purpose. Accord, *Commonwealth* v. *O'Neal,* —— Mass. ——, ——, 339 N. E. 2d 676, 685 (1975); *People* v. *Anderson,* 6 Cal. 3d 628, 651, 493 P. 2d 880, 896, cert. denied, 406 U. S. 958 (1972).

[15] See, *e. g.,* H. Hart, Punishment and Responsibility 8–10, 71–83 (1968); H. Packer, Limits of the Criminal Sanction 38–39, 66 (1968).

by law. When people begin to believe that organized society is unwilling or unable to impose upon criminal offenders the punishment they 'deserve,' then there are sown the seeds of anarchy—of self-help, vigilante justice, and lynch law.' " *Ante,* at 183, quoting from *Furman* v. *Georgia, supra,* at 308 (STEWART, J., concurring).

This statement is wholly inadequate to justify the death penalty. As my Brother BRENNAN stated in *Furman,* "[t]here is no evidence whatever that utilization of imprisonment rather than death encourages private blood feuds and other disorders." 408 U. S., at 303 (concurring opinion).[16] It simply defies belief to suggest that the death penalty is necessary to prevent the American people from taking the law into their own hands.

In a related vein, it may be suggested that the expression of moral outrage through the imposition of the death penalty serves to reinforce basic moral values—that it marks some crimes as particularly offensive and therefore to be avoided. The argument is akin to a deterrence argument, but differs in that it contemplates the individual's shrinking from antisocial conduct, not because he fears punishment, but because he has been told in the strongest possible way that the conduct is wrong. This contention, like the previous one, provides no support for the death penalty. It is inconceivable that any individual concerned about conforming his conduct to what society says is "right" would fail to realize that murder is "wrong" if the penalty were simply life imprisonment.

The foregoing contentions—that society's expression of moral outrage through the imposition of the death penalty pre-empts the citizenry from taking the law into its

---

[16] See *Commonwealth* v. *O'Neal, supra,* at —, 339 N. E. 2d, at 687; Bowers, *supra,* n. 13, at 135; Sellin, *supra,* n. 2, at 79.

own hands and reinforces moral values—are not retributive in the purest sense. They are essentially utilitarian in that they portray the death penalty as valuable because of its beneficial results. These justifications for the death penalty are inadequate because the penalty is, quite clearly I think, not necessary to the accomplishment of those results.

There remains for consideration, however, what might be termed the purely retributive justification for the death penalty—that the death penalty is appropriate, not because of its beneficial effect on society, but because the taking of the murderer's life is itself morally good.[17] Some of the language of the opinion of my Brothers STEWART, POWELL, and STEVENS in No. 74–6257 appears positively to embrace this notion of retribution for its own sake as a justification for capital punishment.[18] They state:

> "[T]he decision that capital punishment may be the appropriate sanction in extreme cases is an expression of the community's belief that certain crimes are themselves so grievous an affront to humanity that the only adequate response may be the penalty of death." *Ante,* at 184 (footnote omitted).

---

[17] See Hart, *supra,* n. 15, at 72, 74–75, 234–235; Packer, *supra,* n. 15, at 37–39.

[18] MR. JUSTICE WHITE's view of retribution as a justification for the death penalty is not altogether clear. "The widespread reenactment of the death penalty," he states at one point, "answers any claims that life imprisonment is adequate punishment to satisfy the need for reprobation or retribution." *Roberts* v. *Louisiana, post,* at 354. (WHITE, J., dissenting). But MR. JUSTICE WHITE later states: "It will not do to denigrate these legislative judgments as some form of vestigial savagery or as purely retributive in motivation; for they are solemn judgments, reasonably based, that imposition of the death penalty will save the lives of innocent persons." *Post,* at 355.

They then quote with approval from Lord Justice Denning's remarks before the British Royal Commission on Capital Punishment:

> " 'The truth is that some crimes are so outrageous that society insists on adequate punishment, because the wrong-doer deserves it, irrespective of whether it is a deterrent or not.' " *Ante,* at 184 n. 30.

Of course, it may be that these statements are intended as no more than observations as to the popular demands that it is thought must be responded to in order to prevent anarchy. But the implication of the statements appears to me to be quite different—namely, that society's judgment that the murderer "deserves" death must be respected not simply because the preservation of order requires it, but because it is appropriate that society make the judgment and carry it out. It is this latter notion, in particular, that I consider to be fundamentally at odds with the Eighth Amendment. See *Furman* v. *Georgia,* 408 U. S., at 343–345 (MARSHALL, J., concurring). The mere fact that the community demands the murderer's life in return for the evil he has done cannot sustain the death penalty, for as JUSTICES STEWART, POWELL, and STEVENS remind us, "the Eighth Amendment demands more than that a challenged punishment be acceptable to contemporary society." *Ante,* at 182. To be sustained under the Eighth Amendment, the death penalty must "compor[t] with the basic concept of human dignity at the core of the Amendment," *ibid.;* the objective in imposing it must be "[consistent] with our respect for the dignity of [other] men." *Ante,* at 183. See *Trop* v. *Dulles,* 356 U. S. 86, 100 (1958) (plurality opinion). Under these standards, the taking of life "because the wrongdoer deserves it" surely must

fall, for such a punishment has as its very basis the total denial of the wrongdoer's dignity and worth.[19]

The death penalty, unnecessary to promote the goal of deterrence or to further any legitimate notion of retribution, is an excessive penalty forbidden by the Eighth and Fourteenth Amendments. I respectfully dissent from the Court's judgment upholding the sentences of death imposed upon the petitioners in these cases.

---

[19] See *Commonwealth* v. *O'Neal, supra,* at ——, 339 N. E. 2d, at 687; *People* v. *Anderson,* 6 Cal. 3d, at 651, 493 P. 2d, at 896.